Marc Toberoff (CA State Bar No. 188547)
   *mtoberoff@toberoffandassociates.com*
Douglas Fretty (CA State Bar No. 279829)
   *dfretty@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Attorneys for Plaintiff Lesia Anson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESIA ANSON, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>HARVEY WEINSTEIN, BOB WEINSTEIN, THE WEINSTEIN COMPANY, LLC, a limited liability company; DIMENSION FILMS, a corporation; MIRAMAX, LLC, a limited liability company, LIONSGATE ENTERTAINMENT CORPORATION, ENTERTAINMENT ONE LTD., a Canadian corporation, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 2:17-cv-08360<br><br>**COMPLAINT FOR**:<br><br>[1] COPYRIGHT INFRINGEMENT (17 U.S.C. §§ 101 *ET SEQ*.);<br>[2] CONTRIBUTORY COPYRIGHT INFRINGEMENT;<br>[3] VICARIOUS COPYRIGHT INFRINGEMENT;<br>[4] COPYRIGHT INFRINGEMENT (CANADA);<br>[5] COPYRIGHT INFRINGEMENT (SPAIN);<br>[6] VIOLATION OF LANHAM ACT (15 U.S.C. § 1125(a)(1)(B));<br>[7] VIOLATION OF CALIFORNIA BUS. AND PROF'L CODE §§ 17200 *ET SEQ.* and 17500 *ET SEQ*; and CALIFORNIA COMMON LAW UNFAIR COMPETITION; and<br>[8] DECLARATORTY RELIEF (28 U.S.C. § 2201).<br><br>DEMAND FOR JURY TRIAL |

Plaintiff LESIA ANSON (hereinafter, the "Plaintiff"), by and through her attorney of record, hereby alleges as follows:

## JURISDICTION AND VENUE

1.     This is a civil action for copyright infringement and injunctive relief under the United States Copyright Act, 17 U.S.C. §§ 101 *et seq.* (hereinafter, "the Copyright Act"), for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and related state law claims.

2.     This Court has original subject matter jurisdiction over the claims set forth in this complaint pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq.*, 28 U.S.C. §§ 1331, 1332, and 1338(a) and (b), and the Declaratory Judgment Act, 28 U.S.C.§ 2201.

3.     This Court has supplemental jurisdiction over the related state claims herein pursuant to 28 U.S.C. § 1367 (a) in that these claims form part of the same case and controversy as the federal claims herein.

4.     This Court has personal jurisdiction over the defendants in that defendants are regularly doing business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

5.     Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because the wrongful acts that give rise to the claims herein below occurred in this District and because defendants THE WEINSTEIN COMPANY, DIMENSION FILMS, MIRAMAX, LLC, LIONSGATE ENTERTAINMENT CORPORATION, and ENTERTAINMENT ONE LTD. (hereinafter collectively, the "Defendants"), have places of business or maintain offices in this District.

## NATURE OF THE ACTION

6.      Plaintiff LESIA ANSON is the widow and heir of Jay Anson (hereinafter, the "Author"), author of the best-selling fictional novel The Amityville Horror (hereinafter, the "Novel"), and she is the proprietor of the copyright in the Novel.

7.      Defendants THE WEINSTEIN COMPANY and DIMENSION FILMS are very tightly controlled by the brothers HARVEY WEINSTEIN and BOB WEINSTEIN, as was MIRAMAX previously. These are sophisticated entertainment companies whose core businesses are based on the value, exploitation and enforcement of copyrights.

8.      This case arises out of Defendants' unlawful production and recent release of a theatrical sequel motion picture entitled *Amityville: The Awakening* (formerly known as *The Amityville Horror: The Lost Tapes*) – a work clearly derived from the Novel, and promoted by Defendants as *a sequel* to the successful 1979 and 2005 films, entitled *The Amityville Horror,* based on the Novel.

9.      In fact, the WEINSTEINS previously co-financed and co-distributed *The Amityville Horror* (2005), and, as such, were intimately familiar with the Novel and the film franchise it launched. Yet so brazen and unbridled were the WEINSTEINS' desire to hijack the Novel and franchise that they never even attempted to license from Plaintiff the requisite underlying rights, a license they could well have afforded. To make matters worse, the *Amityville Horror* sequel film they illegally produced was of such poor quality, and consequently performed so miserably at the box office, that it substantially damaged the value of Plaintiff's intellectual property. Evidently, HARVEY and BOB WEINSTEIN believe they are perched above the law, and can willfully misappropriate another's property with impunity. As this case will demonstrate, they are soundly mistaken.

**PARTIES**

10.    Plaintiff LESIA ANSON is an individual and citizen of, and resides in, the State of Florida, in the County of Alachua, and is and at all times has been a citizen of the United States.

11.    Plaintiff is informed and believes and based thereon alleges that Defendant THE WEINSTEIN COMPANY LLC (hereinafter "TWC") is a limited liability company organized and existing under the laws of the State of Delaware, which has its corporate headquarters in the State of New York, and which regularly conducts significant ongoing business in the State of California and in the County of Los Angeles.

12.    Plaintiff is informed and believes and based thereon alleges that Defendant DIMENSION FILMS (hereinafter "DIMENSION") is a division of Defendant TWC, which has its corporate headquarters in the State of New York, and which regularly conducts significant ongoing business in the State of California and in the County of Los Angeles, and that DIMENSION is a wholly-owned division of Defendant TWC.

13.    Plaintiff is informed and believes and based thereon alleges that Defendant MIRAMAX, LLC (hereinafter "MIRAMAX") is a limited liability company organized and existing under the laws of the State of Delaware, which has its principal place of business in the State of California and in the County of Los Angeles, and that MIRAMAX was previously owned and controlled by HARVEY WEINSTEIN and BOB WEINSTEIN.

14.    Plaintiff is informed and believes and based thereon alleges that Defendant HARVEY WEINSTEIN is an individual and citizen of, and resides in the State of New York, and is and at all times has been a citizen of the United States.  Plaintiff is further informed and believes and based thereon alleges that HARVEY WEINSTEIN regularly conducts significant ongoing business in the State of California and in the County of Los Angeles. Plaintiff is further

informed and believes and based thereon alleges that HARVEY WEINSTEIN is a founder, principal and co-owner of Defendants TWC and DIMENSION, and was the founder, and previously, a principal and an owner of Defendant MIRAMAX.

15.    Plaintiff is informed and believes and based thereon alleges that Defendant BOB WEINSTEIN is an individual and citizen of, and resides in the State of New York, and is and at all times has been a citizen of the United States.  BOB WEINSTEIN is the brother of HARVEY WEINSTEIN, and for decades, and at all times relevant hereto, was HARVEY WEINSTEIN'S close business partner.  Plaintiff is further informed and believes and based thereon alleges that BOB WEINSTEIN, like HARVEY WEINSTEIN, regularly conducts significant ongoing business in the State of California and in the County of Los Angeles. Plaintiff is further informed and believes and based thereon alleges that BOB WEINSTEIN is a co-founder, co-principal and co-owner of Defendants TWC and DIMENSION, and was the co-founder, and previously, the co-principal and co-owner of Defendant MIRAMAX.

16.    Plaintiff is informed and believes and based thereon alleges that at all time relevant hereto Defendants HARVEY WEINSTEIN and his brother BOB WEINSTEIN (hereinafter collectively, the WEINSTEINS) closely owned and controlled TWC and DIMENSION, and that all significant business and legal affairs of TWC and DIMENSION, regarding the subject matter of this action were knowingly made, determined and substantially controlled by the WEINSTEINS personally.

17.    Plaintiff is informed and believes and based thereon alleges that Defendants TWC, DIMENSION, HARVEY WEINSTEIN and BOB WEINSTEIN are, and at all times material hereto were, the alter-egos of each other and there exists and has existed at all times material hereto a unity of interest and ownership among such Defendants such that any separateness has

1  ceased to exist in that Defendants, and/or each of them, used assets of the other

2  Defendants, and/or each of them, for its and/or their separate, individual

3  purposes, and caused valuable assets, property, rights and/or interests to be

4  transferred to each other without adequate consideration.

5        18.    Plaintiff is informed and believes and based thereon alleges that at

6  all times relevant hereto Defendant Lions Gate Entertainment Corporation d.b.a.

7  Lionsgate (hereinafter, "LIONSGATE") is an American, Canadian domiciled

8  company formed in Vancouver, British Columbia, and has its principal place of

9  business in the State of California and in the County of Los Angeles.

10       19.    Plaintiff is informed and believes and based thereon alleges that at

11 all times relevant hereto Defendant Entertainment One Ltd. (hereinafter,

12 "ENTERTAINMENT ONE") is a Canadian distributor based in Toronto,

13 Canada which does ongoing business in the State of California and in the

14 County of Los Angeles.

15       20.    Plaintiff is informed and believes and based thereon alleges that the

16 fictitiously named Defendants captioned hereinabove as Does 1 through 10,

17 inclusive, and each of them (hereinafter "DOE(S)") were in some manner

18 responsible or legally liable for the actions, damages, events, transactions and

19 circumstances alleged herein.  The true names and capacities of such fictitiously

20 named defendants, whether individual, corporate, associate, or otherwise are

21 presently unknown to Plaintiff, and Plaintiff will amend this Complaint to assert

22 the true names and capacities of such fictitiously named Defendants when the

23 same have been ascertained.  For convenience, each reference herein to a named

24 Defendant or to Defendants shall also refer to the Doe Defendants and each of

25 them.

26       21.    Plaintiff is informed and believes and based thereon alleges that

27 each of the Defendants was the agent, partner, servant, employee, or employer of

28 each of the other Defendants herein, and that at all times herein mentioned, each

1    of the Defendants was acting within the course and scope of such employment,

2    partnership and/or agency and that each of the Defendants is jointly and

3    severally responsible for the damages hereinafter alleged.

4                    **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

5            22.    Plaintiff LESIA ANSON is the widow and heir of Jay Anson

6    (hereinafter, the "Author") the author of the world-famous novel, <u>The</u>

7    <u>Amityville Horror</u> (hereinafter, the "Novel"). Although marketed as "A True

8    Story," the Novel is clearly a work of fiction, replete with fantastic literary

9    creations (*e.g*., room(s) which are the sources of evil, ceilings and walls oozing

10   green slime, plagues of flies in the dead of winter, demonic possessions, people

11   levitating and floating away, a young woman transformed into a toothless old

12   hag and then back to her natural state, a child talking to the supernatural spirit

13   form of an enormous flying pig with red eyes, etc.)

14           23.    The Novel was registered for copyright on July 29, 1977

15   (Registration number A00000883095) and was first published on or about

16   September 13, 1977.  The Author died on March 12, 1980. Subsequent to the

17   Author's death, the copyright to the Novel was duly renewed by Plaintiff, as the

18   Author's widow, on December 23, 2004 (Registration number RE0000925090).

19   Attached hereto as Exhibit "A" is a true and correct copy of Plaintiff's renewal

20   registration certificate from United States Copyright Office for the Novel.

21           24.    In 1979 a theatrical feature-length motion picture entitled *The*

22   *Amityville Horror* based upon and derived from duly licensed rights in the Novel

23   (hereinafter, the "1979 Amityville Horror Film") was produced by Professional

24   Films, Inc. ("PFI") and distributed by American International Pictures ("AIP").

25           25.    In 2005 a theatrical feature-length motion picture remake, based

26   upon and derived from the Novel and the 1979 Amityville Horror Film, also

27   entitled *The Amityville Horror* (hereinafter, the "2005 Amityville Horror Film")

28   was co-produced, co-financed and co-distributed by Defendant DIMENSION

1 and MGM (MGM was purportedly the successor to PFI and AIP) (the derivative

2 1979 Amityville Horror Film and 2005 Amityville Horror Film are hereinafter

3 collectively, the "Derivative Amityville Horror Films").

4      26.    Plaintiff is informed and believes and based thereon alleges that in

5 or about 2005, DIMENSION was used as a label within MIRAMAX to produce

6 and release genre films like the 2005 Amityville Horror Film; that in or about

7 1993, MIRAMAX had been purchased by the Walt Disney Company

8 ("Disney"), and that the WEINSTEINS continued to operate MIRAMAX until

9 they left the company on or about September 30, 2005.

10      27.    Plaintiff is informed and believes and based thereon alleges that

11 under the terms of the WEINSTEINS' departure from Disney they took

12 Defendant DIMENSION with them and made it a wholly-owned division of

13 Defendant TWC, but that DIMENSION'S interests in all films which it had been

14 produced or released prior to October 1, 2005, including the 2005 Amityville

15 Horror Film, remained the property of Defendant MIRAMAX.

16      28.    Plaintiff is informed and believes and based thereon alleges that on

17 or about December 3, 2010 MIRAMAX was sold by Disney to Filmyard

18 Holdings, a joint venture of Colony Capital, Tutor-Saliba Corporation, and the

19 Qatar Investment Authority; and that on or about March 2, 2016, MIRAMAX

20 was sold to beIN Media Group, a Qatari entertainment company owned by Al

21 Jazeera Media Network.

22      29.    On or about September 27, 2017, Defendants TWC and

23 DIMENSION announced their release of a feature-length motion picture entitled

24 *Amityville*: *The Awakening* written and directed by Frank Khalfoun (hereinafter,

25 the "2017 Amityville Horror Sequel Film"). Thereafter, the 2017 Amityville

26 Horror Sequel Film was streamed on Google Play from October 12 to November

27 8, 2017, and released in theatres on October 28, 2017.

28      30.    Plaintiff is informed and believes and based thereon alleges that the

2017 Amityville Horror Sequel Film is scheduled to be released by Defendant LIONSGATE in Blu-Ray, DVD and digital HD on November 14, 2017.

31.     After its theatrical bow on October 28, 2018, the 2017 Amityville Horror Sequel Film was widely reported to be "a sequel to the 1979's The Amityville Horror"; "a reboot of the classic 1979 original movie 'The Amityville Horror'"; "a direct sequel to The Amityville Horror – the 1979 horror [film]" etc., just as the WEINSTEINS, TWC and DIMENSION had intended and promoted it, and, on information and belief, none of the Defendants took any action to correct this intended public impression.

32.     The 2017 Amityville Horror Sequel Film is a cinematic mess and received dreadful reviews (*e.g*., a "squashed green tomato" and 20% score on *Rotten Tomatoes*).

33.     Plaintiff is informed and believes and based thereon alleges that Defendants' botched 2017 Amityville Horror Sequel Film suffered  one of the worst opening weekends of all time, grossing only $742 from 10 theaters or an average of $74 per theater.

34.     Plaintiff is informed and believes and based thereon alleges that in or about 2011, DIMENSION and MIRAMAX had entered into a pact to produce and distribute sequel motion pictures derived from MIRAMAX'S better-known films, like the 2005 Amityville Horror Film; that the 2017 Amityville Horror Sequel Film was developed pursuant this and that a prior iteration of this intended sequel was entitled *The Amityville Horror: The Lost Tapes.*

35.     Plaintiff is informed and believes and based thereon alleges that the credited production companies of the 2017 Amityville Horror Sequel Film are Defendants DIMENSION and MIRAMAX, the same parties -- currently or previously owned by the WEINSTEINS -- that were involved in the 2005 Amityville Horror Film based upon the Novel, and that the sequel film is distributed by Defendants TWC and/or DIMENSION.

36.     Plaintiff is informed and believes and based thereon alleges that DIMENSION'S principal BOB WEINSTEIN, having directly participated in the 2005 Amityville Horror Film, announced during the Cannes Film Festival in a press release regarding its planned The Amityville Horror sequel film that "[w]e are thrilled to return to the mythology of The Amityville Horror with a new and terrifying vision that will satisfy our existing fans … ," and that a producer of the intended The Amityville Horror sequel film employed by DIMENSION added: "I'm thrilled to be working with Bob to reinvent one of the all-time great horror franchises … ."

37.     Plaintiff is informed and believes and based thereon alleges that based on the WEINSTEINS' and DIMENSION'S press releases, promotion and advertising of their new Amityville Horror film, the 2017 Amityville Horror Sequel Film was widely anticipated and considered to be, both within and outside the entertainment industry as *a sequel* to their 2005 Amityville Horror Film as specifically intended by the WEINSTEINS and a continuation of the film franchise derived from the Novel. Plaintiff is further informed and believes and based thereon alleges that for instance, and without limitation, TWC / DIMENSION'S Canadian licensee Defendant ENTERTAINMENT ONE falsely promoted the 2017 Amityville Horror Sequel Film as "a revival of the popular franchise" promulgating misrepresentations by the WEINSTEINS, TWC and DIMENSION.

38.     Plaintiff is further informed and believes and based thereon alleges that Defendants TWC and/or DIMENSION own the foreign distribution rights to the 2017 Amityville Horror Sequel Film and intend to distribute this film in all foreign territories outside the United States, including Canada and Spain, and that they have concluded and/or are in the process of entering into purported licenses with third parties to do so.

39.     Plaintiff is informed and believes and thereon alleges that

Defendants DIMENSION and TWC intend to exploit ancillary products (*e.g.*, merchandising and publications) derived from the 2017 Amityville Horror Sequel Film, and thus, the Novel, without Plaintiff's permission, and that they have concluded and/or are in the process of entering into licenses with third parties to do so.

40.     The title of the 2017 Amityville Horror Sequel Film, *AMITYILLE-THE AWAKENING*, clearly evokes a *sequel* motion picture; *i.e.*, the reawakening of the house, and the supernatural evil forces that reside therein, depicted in the Novel and Derivative Amityville Horror Films.  Plaintiff is informed and believes that due to Defendants' press releases and promotion of the 2017 Amityville Horror Sequel Film, it is and will continue to be perceived both by members of the entertainment business and the general public as a legitimate sequel to the Derivative Amityville Horror Films based on the Novel.

41.     The 2017 Amityville Horror Sequel Film, like Defendants' 2005 Amityville Horror Film is substantially similar to the Novel and contains substantially similar literary elements to those of the Novel, as further shown below. As such, Defendants' exploitation of their 2017 Amityville Horror Sequel Film and ancillary rights and products knowingly exploits and infringes Plaintiff's copyright in the Novel, including Plaintiff's motion picture rights in the Novel, including sequel motion picture rights, merchandising rights in the Novel, and Plaintiff's right under copyright to authorize derivative works based upon the Novel.

42.     Defendants TWC, DIMENSION and LIONSGATE also widely distributed various promotional trailers (hereinafter, the "Trailer(s)") for their 2017 Amityville Horror Sequel Film which likewise infringed and continue to infringe Plaintiff's copyright in the Novel. One Trailer even conspicuously features the Novel, clipped from the 2017 Amityville Horror Sequel Film, with "THE AMITYVILLE HORROR by Jay Anson", prominently displayed on its

cover.

43.    Plaintiff is informed and believes and based thereon alleges that Defendants, having produced, co-financed and co-distributed the 2005 Amityville Horror Film based upon the Novel, were very well acquainted with the Novel and knew or should have known that their 2017 Amityville Horror Sequel Film qualified as a derivative work of the Novel, and exploited many of the Novel's protected literary elements. Yet at no time prior to producing their 2017 Amityville Horror Sequel Film did Defendants TWC, DIMENSION or MIRAMAX contact Plaintiff to license, or even inquire as to the status of sequel motion picture and ancillary rights to the Novel.

44.    On October 10, 2017, Plaintiff's counsel sent Defendants a written cease and desist letter placing Defendants on further written notice of what was already abundantly clear to them – they lacked the proper chain-of-title and authority to exploit the 2017 Amityville Horror Sequel Film because they lacked the requisite rights to the Novel from which their sequel film was obviously derived. Defendants nonetheless blithely proceeded with their plans to release and distribute the 2017 Amityville Horror Sequel Film without the underlying rights to do so.

45.    Defendants clearly had access to the original Novel. In fact, both their shooting script for the infringing 2017 Amityville Horror Sequel Film and the film itself includes numerous direct references to the Novel including characters reviewing the Novel and discussing its contents, as shown in more detail below.

46.    The 2017 Amityville Horror Sequel Film makes express references to the Novel and the Derivative Amityville Horror Films. For instance, as the lead protagonist watches the 1979 Amityville Horror Film with her school friends, scenes in that film derived from the Novel are shown. The derivative 2005 Amityville Horror Film is also mentioned and its DVD cover bearing the

title THE AMITYVILLE HORROR is shown. The 2017 Amityville Horror Sequel Film displays the Novel and its cover, with the title THE AMITYVILLE HORROR" imposed on the house's now iconic "face" with half-moon windows, and the name of the Novel's sole Author, "Jay Anson," prominently displayed.

**Overwhelming Similarities Between the Novel and the**

**2017 Amityville Horror Sequel Film**

47.     Numerous elements from Defendants' 2017 Amityville Horror Sequel Film, from beginning to end, including without limitation the characters, relationships, themes, setting, story, plot devices, and the interplay and sequencing of these elements, are substantially similar to and derived from original elements in the Novel that are copyright protectable.

48.     Even the most cursory review of the 2017 Amityville Horror Sequel Film reveals glaring and substantial similarities to the Novel.  Set forth below are some of the more obvious similarities

| **The Amityville Horror Novel** | **The 2017 Amityville Horror Sequel Film** |
|---|---|
| A. The title of the Novel is The Amityville Horror, as was the title of the derivative 1979 film and the title of the derivative 2005 film, in which Defendants WEINSTEINS, DIMENSION and MIRAMAX all participated. | The film was originally entitled The Amityville Horror: The Lost Tapes, and then Amityville: The Awakening; itself suggesting a derivative sequel to the Novel and the Derivative Amityville Horror Films. |
| B. Documentary or forensic framing of the story at the beginning and end of the Novel. | Documentary or forensic framing of the story at the beginning and end of the 2017 Amityville Horror Sequel Film. |

C.  The prologue to the Novel starts with documentary-style television news footage describing how, in November 1974, Ronald DeFeo had taken a high-powered rifle and methodically shot to death his entire family at 112 Ocean Avenue in Amityville, New York (hereinafter the "DeFeo Murders").

The prologue to the 2017 Amityville Horror Sequel Film consists of documentary-style television news footage describing how, in November 1974, Ronald DeFeo had taken a high-powered gun and methodically shot to death his entire family at 112 Ocean Avenue in Amityville, New York.

D. The setting is the same house at 112 Ocean Avenue in Amityville, with the now iconic half-moon quarter windows that make the house look like a face, and when illuminated at night, like a Halloween "pumpkin face" – The Amityville Horror house.

The setting is the same house at 112 Ocean Avenue in Amityville. Although the actual house has not had the iconic half-moon quarter windows in decades, and the 2017 Amityville Horror Sequel Film takes place in the present, its house includes and emphasizes the half-moon windows to capitalize on the Novel, the Derivative Amityville Horror Films and franchise.

E. The DeFeo Murders led to the haunting of The Amityville Horror house. The overall story revolves around a new family that moves into The Amityville Horror house.

The DeFeo Murders led to the haunting of the Amityville Horror house. The overall story revolves around a new family that moves into The Amityville Horror House.

The supernatural demonic forces inhabiting the house terrify its new residents, causing them to lose a grip on reality, and to turn on one another.

F. Thematically, there are dark unknowable supernatural forces in the world, and in particular demons which historically occupy earthly settings and prey on negative human emotions and frailties.

G. Thematically, we cannot understand or control the supernatural which can readily alter our state of consciousness and blur the lines between our subconscious and reality.

H. Time is modern and seasonally, it is the end of the year.

I. The mood is dark, brewing and increasingly frightening.

J. The story begins with a new family pulling into the driveway

The supernatural demonic forces inhabiting the house terrify its new residents, causing them to lose a grip on reality, and to turn on one another.

Thematically, there are dark unknowable supernatural forces in the world, and in particular demons which historically occupy earthly settings and prey on negative human emotions and frailties.

Thematically, we cannot understand or control the supernatural which can readily alter our state of consciousness and blur the lines between our subconscious and reality.

Time is modern and seasonally, it is the end of the year.

The mood is dark, brewing and increasingly frightening.

The story begins with a new family pulling into the driveway of the

of the house at 112 Ocean Avenue, and moving in.

house at 112 Ocean Avenue, and moving in.

K. On a lamp post at the end of the paved driveway is a small sign bearing the name "High Hopes." This was the actual sign of the DeFeo family (although it was reputedly destroyed after the DeFeo Murders).

The same "High Hopes" sign is later seen stored in the basement of the house (even though it was reputedly destroyed after the DeFeo Murders).

L. As the family is moving in, there are boxes around and the furniture and personal items are put into place over the course of the story.

As the family is moving in, there are boxes around and the furniture and personal items are put into place over the course of the story.

M.  The biological father is not present, the biological mother is present, the family has three children, and one of these children is a little girl ("Missy") who is 5 years old, has blonde hair, and is portrayed as very sweet, naive and innocent.

The biological father is not present, the biological mother is present, the family has three children, and one of these children is a little girl ("Juliet") who looks 5 years old, has blonde hair, and is portrayed as very sweet, naive and innocent.

N. The family has a large mangy dog with a male human name, uncommon for a pet: "Harry."

The family has a large mangy dog with a male human name, uncommon for a pet: "Larry."

O. The mother ("Kathy") is quite religious and a devout Christian.

The mother ("Joan") was quite religious and a devout Christian; and later she reverts to her faith.

P.  Harry, the dog, is the first to sense unseen forces. Thereafter, throughout the story, the dog reacts to unseen evil by barking, growling, pawing the ground, and/or whimpering, surprising family members.

Larry, the dog, is the first to sense unseen forces. Thereafter, throughout the story, the dog reacts to unseen evil by barking, growling, pawing the ground, and/or whimpering, surprising family members.

Q. Several features of the house are focused on as notable: the half-moon quarter windows, the boathouse outside, and later, the secret hidden room in the basement.

Several features of the house are focused on as notable: the half-moon quarter windows, the remains of the boathouse outside, and later, the secret hidden room in the basement.

R. The lead protagonist looks out a window wearily and notices that the dog is restless at the boathouse.

The lead protagonist looks out a window wearily and notices that the dog is restless at the boathouse.

S.  The lead protagonist senses that something is very weird about the house. Otherworldly whispering is heard in the house.

The lead protagonist exclaims "I have a weird feeling about this house." Otherworldly whispering is heard in the house.

| | |
|---|---|
| T. There are inexplicable house flies in the winter which soon appear to be the harbinger of a supernatural evil force. | There are inexplicable house flies in the winter which soon appear to be the harbinger of a supernatural evil force. |
| U. The house has cold spots and foul smells, sometimes without any apparent source. | The house has cold spots and foul smells, sometimes without any apparent source. |
| V. At night, the lead protagonist feels the sudden need to wander through the house. | At night, the lead protagonist feels the sudden need at night to wander through the house. |
| W. The lead protagonist does research on the DeFeo Murders at the library viewing microfiche of newspaper accounts. | The lead protagonist does research on the DeFeo Murders at school viewing old newspaper accounts online. |
| X. Family members start sleeping together as they become increasingly frightened by weird events in the house. | Family members start sleeping together as they become increasingly frightened by weird events in the house. |
| Y. As the evil force emerges so does a threatening black *swarm* of buzzing house flies. | As the evil force emerges so does a threatening black *swarm* of buzzing house flies. |

Z. A priest who counsels the family, but is set in his ways, makes a professional visit to the house and is challenged by the evil supernatural force. Terrified, he abruptly departs the house, without an explanation to the family, never to return.

A doctor who counsels the family, but is set in his ways, makes a professional visit to the house and is challenged by the evil supernatural force. Terrified, he abruptly departs the house, without an explanation to the family, never to return.

AA. The lead protagonist wakes up regularly at 3:15 a.m. (the time we are told the DeFeo Murders took place), followed by mysterious, unexplainable and often very frightening visions and events.

The lead protagonist wakes up regularly at 3:15 a.m. (the time we are told the DeFeo Murders took place), followed by mysterious, unexplainable and often very frightening visions and events.

BB. 3:15 a.m. is when the house supernaturally comes alive.

We are told "3:15 a.m., that's when the house comes alive."

CC. In the middle of the night the lead protagonist is repeatedly awakened, seemingly driven into a state of altered consciousness by a supernatural evil force, unable to distinguish reality from nightmares; and as the story unfolds, the line becomes progressively blurred.

In the middle of the night the lead protagonist is repeatedly awakened, seemingly driven into a state of altered consciousness by a supernatural evil force, unable to distinguish reality from nightmares; and as the story unfolds, the line becomes progressively blurred.

1
2   DD. Windows and doors of the house       Windows and doors of the house
3       open, slam shut, and lock all on      open, slam shut, and lock all on
4       their own. The opening windows        their own. The opening windows
5       startle and chill family members,     startle and chill family members,
6       letting in the cold winter air.       letting in the cold winter air. Door
7        Door openings portend the arrival    openings portend the arrival of
8       of supernatural evil forces and       supernatural evil forces and doors
9       doors and windows slamming shut       and windows slamming shut and
10      and locking prevent family            locking prevent family members
11      members from escaping.                from escaping.
12
13  EE. The mother is increasingly on        The mother is increasingly on edge,
14      edge, and quick to lose her temper    and quick to lose her temper and
15      and level accusations at her          level accusations at her child Belle.
16      children.
17
18  FF. The mother, angered, violently       The mother angered hits her
19      beats her children, seemingly for     daughter Belle, seemingly for the
20      the first time, and the following     first time, and the following day
21      day expresses guilt and regret        expresses guilt and regret about it.
22      about it.  The mother's mental state  Later, as the mother's mental state
23      deteriorates under the influence of   deteriorates under the influence of
24      supernatural forces.                  supernatural forces, she knocks her
25                                            daughter unconscious.
26
27  GG. The lead protagonist is drawn to     Juliet is drawn to the remains of the
28      the boathouse; sees an ominous        boathouse, and when she wanders

| | |
|---|---|
| shadow lurking there and is driven to repeatedly check the boathouse at night. | there she is confronted by the vision of a dead body floating in the water. |
| HH. Harry, the dog, has a particular interest in the boathouse, sensing unseen evil forces there. Later at the boathouse the dog panics and strangles itself after jumping a fence on a leash. | Harry, the dog, has a particular interest in the boathouse, sensing unseen evil forces there. Later at the boathouse deck the dog is found dead and bloody, floating in the water. |
| II. Kathy is on the first floor and senses someone is staring at her, she looks up, suddenly sees the little girl Missy and  she exclaims: "Missy! You scared me half to death. What's the matter? What are you doing up so early?" | Belle is on the first floor and senses a presence, she jumps when she suddenly sees the little girl Juliet and she exclaims: "Juliet you can't sneak up on people like that. What are you doing up." |
| JJ. The innocent Missy repeatedly has private friendly chit-chats with the supernatural being which has taken a form she is comfortable with. Missy views this as completely normal, however, it is portrayed as an infiltration and a threat to Missy's safety. | The innocent Juliet repeatedly has private friendly chit-chats with the supernatural being which has taken a form she is comfortable with. Juliet views this as completely normal, however, it is portrayed as an infiltration and a threat to Juliet's safety. |
| KK. At night, Kathy has visions | At night, Belle has visions |

| | |
|---|---|
| of impending violence and murder. | of impending violence and murder. |
| LL. Kathy sees a nightmare image of DeFeo. | Belle sees a nightmare image of DeFeo. |
| MM. Kathy is confronted by the fleeting but terrifying image of a supernatural demonic being. | Belle is confronted by the fleeting but terrifying image of a supernatural demonic being. |
| NN. Repeated references to the "evil" that grips the house. A house visitor exclaims: "There's something bad in here, Kathy." | Belle exclaims "this house is evil" and elsewhere "this house is really bad"! |
| OO. We are informed that the house was associated with occult rituals. | We are informed that the house was associated with occult ritual. |
| PP. The mother enters a walk-in closet, is suddenly confronted by a sour smell and the fact the crucifix she had hung is now upside down due to some demonic force. | The little girl Juliet enters a walk-in closet and is suddenly confronted by a supernatural demonic being. |
| QQ. The mother is both psychologically and physically seduced in an illicit fashion by the supernatural evil entity. | The mother is both psychologically and physically seduced in an illicit fashion by the supernatural evil entity. |

RR. Walls in the house suddenly and inexplicably ooze thick green slime.

Walls in the house suddenly and inexplicably ooze thick dark red blood. *See also* Trailer.

SS. As supernatural tensions increase, the lead protagonist is jarred by the clap of thunder, as a terrible flash of lightening outside lights up the bedroom window.

As supernatural tensions increase, the lead protagonist is jarred by the clap of thunder, as a terrible flash of lightening outside lights up the bedroom window.

TT. Family members see terrifying images at night and have trouble distinguishing their dreams from reality. The lead protagonist exclaims: "I wasn't dreaming I tell you!"

Belle's friend says that the house "messes with your head until you're unable to tell the difference between dreams and reality."

UU. As supernatural tensions increase it starts to rain very heavily.

As supernatural tensions increase it starts to rain very heavily.

VV. Kathy in her bedroom is afraid that if she looks up into *the mirror* she will see the supernatural evil being whose presence she senses.

Belle in her bedroom suddenly sees the terrifying image of a supernatural demonic being *in the mirror*.

WW. A supernatural voice shouts "GET OUT!"

A family member, possessed by a supernatural force, spells out on a special monitor: "G E T  O U T"!

XX. Kathy's face is shockingly transformed into a frighteningly withered 90-year old; when she runs to the bathroom mirror she is no longer a crone, but has deep ugly lines running down her cheeks.

In a Trailer for the 2017 Amityville Horror Sequel Film, Belle sees herself in a bathroom mirror, her face shockingly transformed into a frightening visage with hollow eye sockets, as black flies buzz around her.

YY. A spirit with a large demonic pig's head and beady red eyes appears outside a window of the house, scaring Kathy.

A large demonic pig's head with beady red eyes appears outside a window, scaring Belle. It turns out to be Belle's friend wearing a mask, in reference to the scene in the Novel.

ZZ. In the 1979 Amityville Horror Film based on the Novel, the lead protagonist breaks through a brick wall in the basement with a pick axe, revealing the hidden "Red Room."

The lead protagonist and her school friends watch this 1979 film scene on television, and later the lead protagonist breaks through a brick wall in the basement with a pick axe, revealing the hidden "Red Room."

AAA. We are informed that in pre-colonial times Shinnecock Indians left the sick and mad to die on the property; that they believed it to be

Belle views the 1979 Amityville Horror Film which informs her and us that "this house is built on sacred ground, devil worship,

| | |
|---|---|
| infested with demons; and that in the late 1600's a devil worshipper from Salem, Mass. practiced witchcraft and was buried on the property. | demons …" |
| BBB. Unseen supernatural forces in the house appear to cause electronic equipment to suddenly stop working. | Unseen supernatural forces in the house appear to cause electronic equipment to suddenly stop working. |
| CCC. As the lead protagonist conveys and receives information over the phone regarding the strange activities in the house, the phone suddenly goes dead. | As the lead protagonist receives information from a DVD player / television as to the strange activities in the house both suddenly go dead. |
| DDD. The potential sudden blowing of a fuse causes the lead protagonist to venture in the dark, with a flashlight, down steps into the basement to check the house's fuse box, and is confronted by an awful stench. | The potential sudden blowing of a fuse causes the lead protagonist to venture in the dark, with an iphone flashlight, down steps into the basement to check the house's fuse box, and is confronted by an awful stench. |
| EEE. In the basement, the lead protagonist sees the fleeting bearded visage of the murderer | In the basement, the lead protagonist sees the fleeting bearded visage of the murderer |

| | |
|---|---|
| Ron DeFeo! | Ron DeFeo! |
| FFF. The basement of the house contains a small hidden room with red walls which is called the "Red Room," and it is said to be the source of evil in the house. | The basement of the house contains a small hidden room with red walls which is called the "Red Room," and it is said to be the source of evil in the house. |
| GGG. The Novel contains floor plans of the house, one showing the basement and location of the hidden "Red Room." | Belle is given a copy of the Novel, which she leafs through and turns to the floor plan showing the basement and location of the hidden "Red Room." Later, she holds a copy of this floor plan. |
| HHH. The "Red Room" lies behind wood paneling; the lead protagonist tears off the wood and peers inside, revealing a small creepy room with red walls, and the room emits a vile stench. It is noted "[t]hat's how blood smells." The lead later exclaims that he will wall off the Red Room's entrance *with bricks*! | The "Red Room" lies behind wood paneling and when the lead protagonist tears off the wood, she faces *the brick wall*. After breaking through the wall she peers inside, revealing a small creepy room with walls covered in red blood, and the room emits a vile stench. |
| III. In the middle of the night a shadowy figure approaches a | In the middle of the night a shadowy figure approaches Belle's |

| | |
|---|---|
| child's bed as the child sleeps. | bed as she sleeps. |
| JJJ. The family tries to flee the house, but supernatural forces prevent them from leaving.  The lead protagonist exclaims: "It [the house] won't let us go." | Belle and Juliet try to flee the house but supernatural forces prevent them from leaving.  Belle exclaims: "It [the house"] won't let us leave!" *See also* Trailer. |
| KKK. Towards the end of the story, the mother Kathy has a crucifix with which she unsuccessfully tries to banish the evil force. | Towards the end of the story, the mother Joan has a crucifix with which she unsuccessfully tries to banish the evil force. |
| LLL. The DeFeo Murders are portrayed as potentially linked to an unidentified supernatural force. Kathy has a nightmare of DeFeo shooting at close range and killing his mother (not the other family members he shot). | Joan, the mother, is shot at close range and killed by her son, who has been possessed by a supernatural evil force. |
| MMM. The new family that moved into the house is so terrorized that they flee, leaving everything behind. | What is left of the new family that moved into the house are so terrorized that they flee, leaving everything behind. |
| NNN. The Novel ends with a documentary-style epilogue | The 2017 Amityville Horror Sequel Film ends with documentary news |

| | |
|---|---|
| regarding the strange events that | footage regarding the strange |
| have befallen 112 Ocean Avenue, | events which have once again |
| Amityville, New York. | befallen 112 Ocean Avenue, |
| | Amityville, New York. |

49.   The 2017 Amityville Horror Sequel Film makes direct references to the Novel and the Derivative Amityville Horror Films. For instance, as the lead protagonist watches the 1979 Amityville Horror Film with her school friends, and scenes in that film derived from the Novel are shown. The 2005 Amityville Horror Film is also mentioned and its DVD cover is shown. The 2017 Amityville Horror Sequel Film similarly displays the Novel and its cover, with the title "THE AMITYVILLE HORROR" imposed on the house's now iconic "face" with half-moon windows, and the name of the Novel's sole Author, "Jay Anson," prominently displayed.

50.   Plaintiff is informed and believes and based thereon alleges that Defendants will continue to prepare, produce, copy, distribute or exploit, and/or authorize others to prepare, produce, copy, distribute or exploit the infringing 2017 Amityville Horror Sequel Film and ancillary derivative works which copy and exploit the Novel in violation of the Copyright Act.

51.   As a direct and proximate result of Defendants' actions Plaintiff will suffer imminent and irreparable harm, much of which cannot be reasonably or adequately measured or compensated in damages.

## FIRST CLAIM FOR RELIEF

### (Copyright Infringement against all Defendants and DOES 1-10, excluding ENTERTAINMENT ONE)

52.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 51 inclusive, as though fully set forth herein.

53.   The Novel is a wholly original work and copyrightable subject matter under the laws of the United States.

54.     The Novel was produced and distributed in strict conformity with the provisions of the Copyright Act and all other laws governing copyright.

55.     The Novel was registered by its author Jay Anson for copyright on July 29, 1977 under registration number A00000883095, and subsequent to the author's death on March 12, 1980, such copyright was duly renewed by Plaintiff, the author's widow, on December 23, 2004 under registration number RE0000925090.

56.     By their exploitation and release of the 2017 Amityville Horror Sequel Film, a motion picture indisputably derived from the Novel, Defendants knowingly and willfully infringed, and will continue to infringe, Plaintiff's copyright and rights under copyright in the Novel.

57.     Each infringement by Defendants and/or other parties of the Novel constitutes a separate and distinct act of infringement.

58.     Plaintiff placed Defendants on notice of their infringement, yet Defendants continue to infringe Plaintiff's rights under copyright, in willful disregard of and indifference to Plaintiff's rights.

59.     As a direct and proximate result of Defendants' copyright infringement, Plaintiff has suffered and will continue to suffer severe injuries and harm, much of which cannot be reasonably or adequately measured or compensated in money damages if such wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will continue to cause Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages include, but are not limited to loss of customers, diversion of trade, dilution of goodwill, injury to her business reputation, and the diminution of the value of her intellectual property.

60.     Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a preliminary injunction, during the pendency of this action, and to a permanent injunction, enjoining Defendants, their officers, agents and employees, and all persons

acting in concert with them, from engaging in such further violations of the Copyright Act.

61.    Plaintiff is further entitled to recover from Defendants the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial.

62.    Alternatively, Plaintiff is entitled to the maximum statutory damages recoverable, or for such other amounts as may be proper, pursuant to 17 U.S.C. § 504.

63.    Plaintiff is further entitled to her attorney's fees and full costs pursuant to 17 U.S.C. § 505.

## SECOND CLAIM FOR RELIEF

### (Contributory Copyright Infringement against all Defendants and DOES 1-10, excluding ENTERTAINMENT ONE)

64.    Plaintiff realleges and incorporates by reference the allegations set forth above in Paragraphs 1 through 63 inclusive, as though fully set forth herein.

65.    Plaintiff is informed and believes, and on that basis alleges, that Defendants induced, caused, or materially contributed to the copyright infringement by others of the Novel as alleged herein.  Plaintiff is informed and believes, and on that basis alleges, that Defendants knew or had reason to know that the conduct of such other parties infringed Plaintiff's copyright and rights under copyright.

66.    Each infringement by Defendants and/or other parties of the Novel constitutes a separate and distinct act of infringement.

67.    As a direct and proximate result of Defendants' contributory copyright infringement, Plaintiff has suffered and will continue to suffer severe

injuries and harm, much of which cannot be reasonably or adequately measured or compensated in money damages if such wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will continue to cause Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages include, but are not limited to loss of customers, diversion of trade, dilution of goodwill, injury to her business reputation, and the diminution of the value of her intellectual property.

68.    Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a preliminary injunction, during the pendency of this action, and to a permanent injunction, enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act.

69.    Plaintiff is further entitled to recover from Defendants the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial.

70.    Alternatively, Plaintiff is entitled to the maximum statutory damages recoverable, or for such other amounts as may be proper, pursuant to 17 U.S.C. § 504.

71.    Plaintiff is further entitled to her attorney's fees and full costs pursuant to 17 U.S.C. § 505.

### **THIRD CLAIM FOR RELIEF**

**(Vicarious Copyright Infringement against all Defendants and DOES 1-10, excluding ENTERTAINMENT ONE)**

72.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 71 inclusive, as though fully set forth herein.

73.    Plaintiff is informed and believes and thereon alleges that

1   Defendants, and each of them, if not directly liable for infringement of

2   Plaintiff's copyright in the Novel, are vicariously liable for said infringements.

3   Plaintiff is informed and believes and thereon alleges that Defendants had the

4   right and ability to supervise the infringing conduct of others, including without

5   limitation the infringing conduct of co-Defendants and internet users who have

6   viewed the 2017 Amityville Horror Sequel Film via an online streaming and/or

7   downloading service.

8      74.   Plaintiff is informed and believes and thereon alleges that

9   Defendants possessed a direct financial interest in the infringing conduct of such

10  other parties.

11     75.   Each infringement by Defendants and/or other parties of the Novel

12  constitutes a separate and distinct act of infringement.

13     76.   As a direct and proximate result of Defendants' vicarious copyright

14  infringement, Plaintiff has suffered and will continue to suffer severe injuries

15  and harm, much of which cannot be reasonably or adequately measured or

16  compensated in money damages if such wrongful conduct is allowed to continue

17  unabated. The ongoing harm this wrongful conduct will continue to cause

18  Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages

19  include, but are not limited to loss of customers, diversion of trade, dilution of

20  goodwill, injury to her business reputation, and the diminution of the value of

21  her intellectual property.

22     77.   Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a preliminary

23  injunction, during the pendency of this action, and to a permanent injunction,

24  enjoining Defendants, their officers, agents and employees, and all persons

25  acting in concert with them, from engaging in such further violations of the

26  Copyright Act.

27     78.   Plaintiff is further entitled to recover from Defendants the damages,

28  including pre-judgment interest it sustained and will sustain, and any income,

1    gains, profits, and advantages obtained by Defendants as a result of their

2    wrongful acts alleged hereinabove, in an amount which cannot yet be fully

3    ascertained, but which shall be assessed at the time of trial.

4        79.    Alternatively, Plaintiff is entitled to the maximum statutory

5    damages recoverable, or for such other amounts as may be proper, pursuant to

6    17 U.S.C. § 504.

7        80.    Plaintiff is further entitled to her attorney's fees and full costs

8    pursuant to 17 U.S.C. § 505.

9                        **FOURTH CLAIM FOR RELIEF**

10   **(Copyright Infringement under the Canadian Copyright Act against all**

11                        **Defendants and DOES 1-10)**

12       81.    Plaintiff re-alleges and incorporates herein by this reference

13   paragraphs 1 through 80 inclusive, as though fully set forth herein.

14       82.    Jay Anson, the author of the Novel, died on March 12, 1980.

15       83.    Pursuant to Section 14 (1) of the Canadian Copyright Act, R.S.C.,

16   c. C-42, where, as here, the author is the first owner of a work's copyright, no

17   assignment of copyright or any interest therein made after June 4, 1921, other

18   than an assignment by will, is operative beyond 25 years after the date of the

19   author's death, and at the end of such 25-year period the rights granted

20   automatically revert to the Author's heirs.

21       84.    Accordingly, on March 12, 2005 (25 years after the Author's death)

22   all rights in his Novel under copyright in Canada automatically reverted by

23   operation of law to the Author's heirs, including Plaintiff.

24       85.    Accordingly, on March 12, 2005 all rights in his Novel under

25   copyright in Canada automatically reverted by operation of law to the Author's

26   heirs, including Plaintiff.

27       86.    Plaintiff is informed and believes and based thereon alleges that

28   Defendant ENTERTAINMENT ONE is the distributor of the infringing 2017

Amityville Horror Sequel Film under license from Defendants TWC and/or DIMENSION.

87.    The current or pending exploitation and distribution of the 2017 Amityville Horror Sequel Film in Canada by Defendants, their agents, assigns or licensees knowingly infringes or will infringe Plaintiff's Canadian copyright in the Novel and rights under copyright.

88.    Plaintiff placed Defendants on notice of their infringement, yet Defendants continue with their plans to exploit their infringing 2017 Amityville Horror Sequel Film in Canada in willful disregard of and indifference to Plaintiff's rights.

89.    As a direct and proximate result of Defendants' copyright infringement and/or contributory infringement, Plaintiff has suffered and will continue to suffer severe injuries and harm, much of which cannot be reasonably or adequately measured or compensated in money damages if such wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will continue to cause Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages include, but are not limited to loss of customers, diversion of trade, dilution of goodwill, injury to her business reputation, and the diminution of the value of her intellectual property.

90.    Plaintiff is entitled to a preliminary injunction, during the pendency of this action, and to a permanent injunction, enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, or under a purported license from any of the Defendants, from engaging in such further violations of the copyright laws of Canada including the distribution of the infringing 2017 Amityville Horror Sequel Film in Canada.

91.    Plaintiff is further entitled to recover from Defendants the damages, including pre-judgment interest she sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their

wrongful acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial.

92. Alternatively, Plaintiff is entitled to the maximum statutory damages recoverable, or for such other amounts as may be proper, pursuant to the Canadian Copyright Act.

93. Plaintiff is further entitled to her attorney's fees and full costs.

## FIFTH CLAIM FOR RELIEF

### (Copyright Infringement under the Copyright Act of Spain against all Defendants and DOES 1-10)

94. Plaintiff re-alleges and incorporates herein by this reference paragraphs 1 through 93 inclusive, as though fully set forth herein.

95. Pursuant to Article 6 of Spain's Copyright Act 1879 (Ley de 10 de enero de 1879, de la propiedad intellectual, Gaceta de Madrid num. 12 of January 12, 1879, *http://derecho-internet.org/node/365*)( hereinafter, the "1879 Act"), Spain's Intellectual Property Law 22/1987 which took effect on December 7, 1987, and Spain's Royal Legislative Decree 1/1996 of April 12, 1996, any assignment of a work's copyright or rights under copyright concluded before December 7, 1987 is by operation of law automatically terminated 25 years after the death of the work's author, and automatically reverts to the author's heirs.

96. Accordingly, on March 12, 2005 (25 year after the Author's death) all rights in his Novel under copyright in Spain automatically reverted by operation of law to the Author's heirs, including Plaintiff.

97. The current or pending exploitation and distribution of the 2017 Amityville Horror Sequel Film in Spain by Defendants, their agents, assigns or licensees knowingly infringes or will infringe Plaintiff's Spanish copyright in the Novel and rights under copyright.

98. Plaintiff placed Defendants on notice of their infringement, yet

1  Defendants continue with their plans to exploit their infringing 2017 Amityville
2  Horror Sequel Film in Spain in willful disregard of and indifference to Plaintiff's
3  rights.

4      99.    As a direct and proximate result of Defendants' copyright
5  infringement and/or contributory infringement, Plaintiff has suffered and will
6  continue to suffer severe injuries and harm, much of which cannot be reasonably
7  or adequately measured or compensated in money damages if such wrongful
8  conduct is allowed to continue unabated. The ongoing harm this wrongful
9  conduct will continue to cause Plaintiff is both imminent and irreparable.
10  Plaintiff's injuries and damages include, but are not limited to loss of customers,
11  dilution of goodwill, injury to her business reputation, and the diminution of the
12  value of her intellectual property.

13      100.   Plaintiff is entitled to a preliminary injunction, during the pendency
14  of this action, and to a permanent injunction, enjoining Defendants, their
15  officers, agents and employees, and all persons acting in concert with them, or
16  under a purported license from any of the Defendants, from engaging in such
17  further violations of the copyright laws of Spain, including the distribution of the
18  infringing 2017 Amityville Horror Sequel Film in Spain.

19      101.   Plaintiff is further entitled to recover from Defendants the damages,
20  including pre-judgment interest she sustained and will sustain, and any income,
21  gains, profits, and advantages obtained by Defendants as a result of their
22  wrongful acts alleged hereinabove, in an amount which cannot yet be fully
23  ascertained, but which shall be assessed at the time of trial.

24      102.   Plaintiff is further entitled to her attorney's fees and full costs.

25  //
26  //
27  //
28  //

**SIXTH CLAIM FOR RELIEF**

**(Violation of the Lanham Act § 15 U.S.C. § 1125(a)(1)(B)**

**Against All Defendants and DOES 1-10, excluding**

**ENTERTAINMENT ONE)**

103.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 51 inclusive, as though fully set forth herein.

104.   This Fifth Claim for Relief is for violation of Section 1125(a)(1)(**B**) of the Lanham Act, not Section 1125(a)(1)(**A**).  It pertains to Defendants' false advertising and false promotion of its 2017 Amityville Horror Sequel Film (i) as *a sequel* to their 2005 Amityville Horror Film and to the 1979 Amityville Horror Film and (ii) as a part of this film franchise, and, as such, this claim is independent of and does not rely upon Plaintiff's copyright in the Novel or Defendants' copyright infringement alleged hereinabove.

105.   Plaintiff is informed and believes and thereon alleges that Defendants have misrepresented to their licensees, potential licensees and to members of the public, *in Defendants' commercial marketing, promotion and advertising*, that the 2017 Amityville Horror Film is a bona fide *sequel* to their 2005 Amityville Horror Film and to the 1979 Amityville Horror Film and *a continuation of this film franchise*, with a willful intention to mislead and misrepresent the nature, characteristics and qualities of Defendants' goods, services or commercial activities.

106.   Plaintiff is informed and believes and thereon alleges that Defendants used such false claims or misleading descriptions, representations and wrongful omissions of fact in interstate commerce in order to induce others to enter into contracts or other forms of business arrangements with Defendants to exploit the 2017 Amityville Horror Sequel Film and other products derived therefrom, and to falsely induce consumers to see the film.

107.   Such use of false or misleading descriptions or representations of fact in interstate commerce is in opposition to the protection of the public interest.

108.   Defendants' wrongful conduct has proximately caused and will continue to cause Plaintiff substantial injury and damage including, without limitation, loss of customers, dilution of goodwill, injury to her business reputation, lost profits and diminution of the value of her interests in the Novel, the Derivative Amityville Horror Films, and related derivative products and commercial activities.  The ongoing harm this wrongful conduct will cause to Plaintiff is both imminent and irreparable, and the amount of damage sustained by Plaintiff will be difficult to ascertain if such wrongful conduct is allowed to continue unabated.

109.   By reason of the foregoing, Defendants have violated and are continuing to violate the Lanham Act, 15 U.S.C. § 1125(a)(1)**(B)**.

110.   Plaintiff is entitled to an injunction, during the pendency of this action, and permanently, restraining Defendants, their officers, agents and employees, and all persons acting in concert with them from engaging in any further violations of the Lanham Act.

111.   Plaintiff has no adequate remedy at law with respect to these ongoing violations of the Lanham Act.

112.   Plaintiff is further entitled to recover from Defendants under 15 U.S.C § 1117(a) up to three times the damages she sustained and will sustain and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts and omissions alleged hereinabove, plus reasonable attorneys' fees and costs, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial.

//

//

## SEVENTH CLAIM FOR RELIEF

**(Unfair Competition Under California Business and Professions Code, §§ 17200 *et seq*. and California Common Law - Against All Defendants and DOES 1-10, excluding ENTERTAINMENT ONE)**

113.   Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 51, inclusive, and 103 through 112, inclusive, as though fully set forth herein.

114.   This Sixth Claim for Relief pertains to Defendants' false advertising, marketing and promotion of the 2017 Amityville Horror Sequel Film: (i) as *a sequel* to their 2005 Amityville Horror Film and to the 1979 Amityville Horror Film and (ii) as a part of this film franchise, and, as such, this claim is independent of and does not rely upon Plaintiff's copyright in the Novel or Defendants' copyright infringement alleged hereinabove.

115.   Plaintiff is informed and believes and thereon alleges that Defendants have misrepresented to their licensees, potential licensees and to members of the public, *in Defendants' commercial marketing, promotion and advertising*, that the 2017 Amityville Horror Film is a bona fide *sequel* to their 2005 Amityville Horror Film and to the 1979 Amityville Horror Film and *a continuation of this film franchise*, with a willful intention to mislead and misrepresent the nature, characteristics and qualities of Defendants' goods, services or commercial activities.

116.   Defendants' public misrepresentations in their advertising, marketing and promotion was both intended to deceive, cause confusion and mistake and was likely to deceive, cause confusion and mistake, all contrary to the public interest.

117.   Defendants' wrongful conduct, acts, and omissions alleged hereinabove constitute unlawful, unfair business practices and unfair

competition under California Business and Professions Code §§ 17200 *et seq.*, and under the common law.

118.   As a direct and proximate result of Defendants' conduct, acts, and omissions alleged hereinabove, Plaintiff is entitled to restitution of the income, gains, compensation, profits and advantages obtained, received or to be received by Defendants, or any of them, arising from their unauthorized exploitation of Plaintiff's Novel, and in which Plaintiff possesses an ownership interest; Plaintiff is entitled to an order requiring Defendants, jointly and severally, to render an accounting to ascertain the amount of such proceeds.

119.   As a direct and proximate result of Defendants' wrongful conduct, acts and omissions alleged hereinabove, Plaintiff has been damaged, and Defendants have been and will continue to be unjustly enriched, in an amount that shall be assessed at trial for which restitution and/or restitutionary disgorgement is appropriate.  Such restitution and/or restitutionary disgorgement should include a declaration by this Court that Defendants are jointly and severally the constructive trustee(s) for the benefit of Plaintiff and an order that Defendants convey to Plaintiff all of the gross revenues received or to be received by Defendants arising from their unauthorized exploitation of Plaintiff's Novel.

120.   Defendants' wrongful conduct, acts and omissions have proximately caused and will continue to cause Plaintiff substantial injury and damage including, without limitation, loss of customers, dilution of goodwill, injury to Plaintiff's reputation, and diminution of the value of Plaintiff's rights. The harm this wrongful conduct will cause to Plaintiff is both imminent and irreparable, and the amount of damage sustained by Plaintiff will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint.

121.   Pursuant to California Business and Professions Code § 17203 Plaintiff is entitled to an injunction, during the pendency of this action, and

permanently enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in such further acts of unfair business practices and unfair competition.

122.   Plaintiff has no adequate remedy at law with respect to Defendants' ongoing unlawful conduct.

## EIGHTH CLAIM FOR RELIEF

### (Declaratory Relief - Against All Defendants)

123.   Plaintiff re-alleges and incorporates herein by this reference paragraphs 1 through 122 inclusive, as though fully set forth herein.

124.   By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants in that Plaintiff contends and Defendants deny that Defendants infringed and will continue to infringe on Plaintiff's copyrights under Federal copyright law, 17 U.S.C. §§ 101 *et seq.*

125.   Plaintiff desires a judicial determination of this issue.

126.   A declaration of the Court is necessary and appropriate pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., so that Plaintiff may ascertain her rights with respect to the 2017 Amityville Horror Sequel Film.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

### ON THE FIRST CLAIM FOR RELIEF

1.   For an order preliminarily during the pendency of this action and thereafter, permanently, (i) enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from infringing the copyrights in the Novel, in any manner, and (ii) enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from engaging in or authorizing the

1  production, reproduction, distribution and/or exploitation of the infringing 2017

2  Amityville Horror Sequel Film and ancillary products based thereon, derived

3  from the Novel, without Plaintiff's express written consent.

4      2.    For compensatory and consequential damages, according to proof

5  in an amount determined at trial, together with interest thereon as provided by

6  law;

7      3.    For an accounting and restitution to Plaintiff of all gains, profits and

8  advantages Defendants have derived from their production, distribution and

9  exploitation of the infringing 2017 Amityville Horror Sequel Film, ancillary

10 exploitations based thereon, and from their copyright infringement of the

11 Novel;

12     4.    In the alternative to actual damages, for statutory damages pursuant

13 to 17 U.S.C. §504(c), which election Plaintiff shall make prior to the rendering

14 of final judgment herein; and

15     5.    For such other and further relief and remedies available under the

16 Copyright Act, 17 U.S.C. §§ 101 *et seq.*, which the Court may deem just and

17 proper.

18 <u>ON THE SECOND CLAIM FOR RELIEF</u>

19     6.    For an order preliminarily during the pendency of this action and

20 thereafter, permanently, (i) enjoining Defendants, their officers, agents,

21 employees, licensees and assigns, and all persons acting in concert with them,

22 from infringing the copyrights in the Novel, in any manner, and (ii) enjoining

23 Defendants, their officers, agents, employees, licensees and assigns, and all

24 persons acting in concert with them, from engaging in or authorizing the

25 production, reproduction, distribution and/or exploitation of the infringing 2017

26 Amityville Horror Sequel Film and ancillary products based thereon, derived

27 from the Novel, without Plaintiff's express written consent.

28     7.    For an award of Defendants' profits and Plaintiff's compensatory

1   and consequential damages, according to proof in an amount determined at

2   trial, together with interest thereon as provided by law;

3         8.    In the alternative to actual damages, for an award of statutory

4   damages pursuant to 17 U.S.C. §504(c), which election Plaintiff shall make

5   prior to the rendering of final judgment herein;

6         9.    For an order requiring that Defendants provide a complete

7   accounting and for the restitution to Plaintiff of all monies, gains, profits and

8   advantages Defendants have derived from their production, distribution and

9   exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers,

10  ancillary exploitations based thereon, and from their copyright infringement of

11  the Novel;

12        10.   For an order imposing a constructive trust over all monies, gains,

13  and profits Defendants derive from their production, distribution and

14  exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers,

15  ancillary exploitations based thereon, and from their copyright infringement of

16  the Novel; and

17        11.   For such other and further relief and remedies available under the

18  Copyright Act, 17 U.S.C. §§ 101 *et seq*., which the Court may deem just and

19  proper.

20              <u>ON THE THIRD CLAIM FOR RELIEF</u>

21        12.   For an order preliminarily during the pendency of this action and

22  thereafter, permanently, (i) enjoining Defendants, their officers, agents,

23  employees, licensees and assigns, and all persons acting in concert with them,

24  from infringing the copyrights in the Novel, in any manner, and (ii) enjoining

25  Defendants, their officers, agents, employees, licensees and assigns, and all

26  persons acting in concert with them, from engaging in or authorizing the

27  production, reproduction, distribution and/or exploitation of the infringing 2017

28  Amityville Horror Sequel Film and ancillary products based thereon, derived

1  from the Novel, without Plaintiff's express written consent.

2      13.   For an award of Defendants' profits and Plaintiff's compensatory

3  and consequential damages, according to proof in an amount determined at

4  trial, together with interest thereon as provided by law;

5      14.   In the alternative to actual damages, for an award of statutory

6  damages pursuant to 17 U.S.C. §504(c), which election Plaintiff shall make

7  prior to the rendering of final judgment herein;

8      15.   For an order requiring that Defendants provide a complete

9  accounting and for the restitution to Plaintiff of all monies, gains, profits and

10  advantages Defendants have derived from their production, distribution and

11  exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers,

12  ancillary exploitations based thereon, and from their copyright infringement of

13  the Novel;

14      16.   For an order imposing a constructive trust over all monies, gains,

15  and profits Defendants derive from their production, distribution and

16  exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers,

17  ancillary exploitations based thereon, and from their copyright infringement of

18  the Novel; and

19      17.   For such other and further relief and remedies available under the

20  Copyright Act, 17 U.S.C. §§ 101 *et seq*., which the Court may deem just and

21  proper.

22                      <u>ON THE FOURTH CLAIM FOR RELIEF</u>

23      18.   For an order preliminarily during the pendency of this action and

24  thereafter, permanently, (i) enjoining Defendants, their officers, agents,

25  employees, licensees and assigns, and all persons acting in concert with them,

26  from infringing the copyrights in the Novel, in any manner in Canada, and (ii)

27  enjoining Defendants, their officers, agents, employees, licensees and assigns,

28  and all persons acting in concert with them, from engaging in or authorizing the

reproduction, distribution and/or exploitation of the infringing 2017 Amityville Horror Sequel Film and ancillary products based thereon, derived from the Novel, in Canada, without Plaintiff's express written consent.

19. For an award of Defendants' profits and Plaintiff's compensatory and consequential damages, according to proof in an amount determined at trial, together with interest thereon as provided by law;

20. In the alternative to actual damages, for an award of statutory damages pursuant to the Canadian Copyright Act, which election Plaintiff shall make prior to the rendering of final judgment herein.

21. For an order requiring that Defendants provide a complete accounting and for the restitution to Plaintiff of all monies, gains, profits and advantages Defendants have derived from their distribution and exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers, ancillary exploitations based thereon, and from their copyright infringement of the Novel in Canada;

22. For an order imposing a constructive trust over all monies, gains, and profits Defendants derive from their production, distribution and exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers, ancillary exploitations based thereon, and from their copyright infringement of the Novel in Canada; and

23. For such other and further relief and remedies available, which the Court may deem just and proper.

ON THE FIFTH CLAIM FOR RELIEF

24. For an order preliminarily during the pendency of this action and thereafter, permanently, (i) enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from infringing the copyrights in the Novel, in any manner in Spain and (ii) enjoining Defendants, their officers, agents, employees, licensees and assigns,

and all persons acting in concert with them, from engaging in or authorizing the production, reproduction, distribution and/or exploitation of the infringing 2017 Amityville Horror Sequel Film and ancillary products based thereon, derived from the Novel in Spain, without Plaintiff's express written consent.

25.   For an award of Defendants' profits and Plaintiff's compensatory and consequential damages, according to proof in an amount determined at trial, together with interest thereon as provided by law;

26.   For an order requiring that Defendants provide a complete accounting and for the restitution to Plaintiff of all monies, gains, profits and advantages Defendants have derived from their production, distribution and exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers, ancillary exploitations based thereon, and from their copyright infringement of the Novel in Spain;

27.   For an order imposing a constructive trust over all monies, gains, and profits Defendants derive from their production, distribution and exploitation of the infringing 2017 Amityville Horror Sequel Film and Trailers, ancillary exploitations based thereon, and from their copyright infringement of the Novel in Spain; and

28.   For such other and further relief and remedies which the Court may deem just and proper.

<u>ON THE SIXTH CLAIM FOR RELIEF</u>

29.   For an order preliminarily during the pendency of this action and thereafter permanently enjoining Defendants, their officers, agents, employees, licensees and assigns and all persons acting in concert with them, from engaging in such further violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) as alleged hereinabove;

30.   For treble compensatory and consequential damages according to proof in an amount to be determined at trial;

31.   For an accounting of any and all unlawful proceeds received and to be received by Defendants;

32.   For the imposition of a constructive trust for the benefit of Plaintiff on any and all unlawful proceeds received and to be received by Defendants; and

33.   For such other and further relief and remedies available under the Lanham Act, 15 U.S.C. § 1125, which the Court may deem just and proper.

ON THE SEVENTH CLAIM FOR RELIEF

34.   For an accounting of any and all unlawful proceeds received and to be received by Defendants;

35.   For the imposition of a constructive trust for the benefit of Plaintiff on any and all unlawful proceeds received and to be received by Defendants;

36.   For restitution to Plaintiff of any and all unlawful proceeds received and to be received by Defendants;

37.   For an order preliminarily during the pendency of this action and thereafter, permanently, enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from engaging in such further unfair business practices and unfair competition under California Business and Professions Code §§ 17200 *et seq*., and/or §§17500 *et seq*., as alleged hereinabove; and

38.   For such other and further relief and remedies available under California Business and Professions Code, §§ 17200 *et seq*. and §§ 17500, which the Court may deem just and proper.

ON THE EIGHTH CLAIM FOR RELIEF

39.   For a declaration:

a.       That Defendants have by their foregoing acts infringed upon and are likely to continue to infringe upon the copyrights of the Novel and Plaintiff's copyright interests therein;

1       b. That the preparation, production, reproduction, distribution

2    and/or exploitation, by Defendants, their licensees and/or assigns of the 2017

3    Amityville Horror Sequel Film and further derivative works or products based

4    on the Novel, including, but not limited to, theatrical motion pictures, are

5    prohibited as infringements of Plaintiff's copyright(s); and

6       c. That Defendants had/have no authority to confer licenses or

7    grants on others to reproduce, distribute or exploit the 2017 Amityville Horror

8    Sequel Film or to prepare, distribute or exploit other derivative works or

9    products based on the 2017 Amityville Horror Sequel Film and derived from the

10   Novel.

11   ON ALL CLAIMS FOR RELIEF

12     40. For Plaintiff's costs of suit;

13     41. For interest at the highest lawful rate on all sums awarded Plaintiff

14   other than punitive damages;

15     42. For reasonable attorneys' fees; and

16     43. For such other and further relief as the Court deems just and

17   appropriate.

18

19   Dated: November 15, 2017  TOBEROFF & ASSOCIATES, P.C.

20

21         By: _____*/s/ Marc Toberoff*_____
          Marc Toberoff

22        Attorneys for Plaintiff LESIA ANSON

23

24

25

26

27

28

**JURY TRIAL DEMANDED**

Plaintiff hereby requests a trial by jury on each claim for relief alleged in the Complaint that is triable by a jury.


Dated: November 15, 2017          TOBEROFF & ASSOCIATES, P.C.


By: _____*/s/ Marc Toberoff*_____
                 Marc Toberoff

Attorneys for Plaintiff LESIA ANSON