Louis P. Petrich (State Bar No. 38161)
  *petrichl@ballardspahr.com*
Elizabeth L. Schilken (State Bar No. 241231)
  *schilkene@ballardspahr.com*
BALLARD SPAHR LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400
Facsimile: 424.204.4350

Attorneys for Defendants BOB WEINSTEIN,
LIONS GATE ENTERTAINMENT CORP., and
BLUMHOUSE PRODUCTIONS, LLC

*Ballard Spahr LLP*
*2029 Century Park East, Suite 800*
*Los Angeles, CA  90067-2909*
*Telephone: 424.204.4400*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DISTRICT

| | |
|---|---|
| LESIA ANSON, an individual,<br><br>              Plaintiff,<br><br>   v.<br><br>HARVEY WEINSTEIN, BOB WEINSTEIN, THE WEINSTEIN COMPANY, LLC, a limited liability company; DIMENSION FILMS, a corporation, MIRAMAX, LLC, a limited liability company, LIONSGATE ENTERTAINMENT CORPORATION, ENTERTAINMENT ONE LTD., a Canadian corporation, BLUMHOUSE PRODUCTIONS, LLC, a Delaware limited liability company, LANTERN ENTERTAINMENT LLC, a Delaware limited liability company, and DOES 1 through 10, inclusive,<br><br>              Defendants. | Case No. 2:17-cv-08360-GW (KSx)<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Declaration of Elizabeth L. Schilken, Declaration of Randall L. Jackson, Request for Judicial Notice, Notice of Lodging, Statement of Uncontroverted Facts, and Proposed Judgment filed concurrently herewith.]<br><br>Date:       February 27, 2020<br>Time:      8:30 a.m.<br>Location:   Courtroom 9D<br>           Ninth Floor<br>           U.S. Courthouse<br>           350 W. 1st Street<br>           Los Angeles, CA 90012 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 27, 2020, at 8:30 a.m., or as soon thereafter as this matter may be heard by the above-entitled court, in Courtroom 9D of the United States District Court for the Central District of California, located at 350 West 1ˢᵗ Street, Los Angeles, California 90012, Defendants Lions Gate Entertainment Corp., Bob Weinstein, and Blumhouse Productions, LLC ("Defendants") will and hereby do move this court pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, for summary judgment, or in the alternative, partial summary judgment, as to the First, Second, Third, Fourth and Fifth Claims for Relief in Plaintiff Lesia Anson's ("Plaintiff's") Fourth Amended Complaint ("FAC"), on the ground there is no genuine issue as to any material fact and Defendants are entitled to judgment as a matter of law, for the following reasons:

The First Claim for Relief for Copyright Infringement fails as a matter of law because: 1) Defendants in creating and/or distributing the 2017 film *Amityville: The Awakening* did not "bodily appropriate" protectable expression from the 1977 Jay Anson book *The Amityville Horror*, and Defendants' 2017 film and the 1977 book are not virtually identical; or, in the alternative, 2) there exists no "substantial similarity" of copyright-protectable expression as between the 1977 book and the 2017 motion picture;

The Second Claim for Relief for Contributory Copyright Infringement fails as a matter of law because Plaintiff cannot prove her First Claim for Relief for direct copyright infringement;

The Third Claim for Relief for Vicarious Copyright Infringement fails as a matter of law because Plaintiff cannot prove her First Claim for Relief for direct copyright infringement;

The Fourth Claim for Relief for Violation of the Lanham Act (15 U.S.C. §1125(a)(1)(B)) fails as a matter of law because Plaintiff's claim alleges that Defendants misrepresented the licensing status of their motion picture *Amityville:*

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

*The Awakening*, and Lanham Act claims based on such alleged misrepresentations are barred under *Dastar v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003) and *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008); and

The Fifth Claim for Relief for violation of Cal. Bus. & Prof. Code §17200, *et seq.*, and California common law unfair competition, fails because:  (1) the statutory and common law unfair competition claims are substantially congruent to the Lanham Act claim, and must be dismissed because the Lanham Act claim is barred under *Dastar* and *Sybersound*; (2) regarding her §17200 claim, Plaintiff cannot prove that she is entitled to restitution; and she cannot prove entitlement to an injunction in that she does not have standing, because she has not suffered an injury in fact; and (3) regarding her common law claim, allegations premised on false advertising do not state a cognizable claim for relief.  *Dyson, Inc. v. Garry Vacuum, LLC*, 2010 U.S. Dist. LEXIS 153468, 28-29 (C.D. Cal.).

In the alternative, if the Court does not grant summary judgment as to the entire Fourth Amended Complaint, Defendants hereby move for partial summary judgment as to the First, Second, Third, Fourth, and/or Fifth Claims for Relief. Further, if the Court does not grant summary judgment in full as to the §17200 claim in the Fifth Claim for Relief, Defendants request that the Court grant partial summary judgment, at minimum, against Plaintiff's requested remedies of: (i) an accounting; (ii) imposition of a constructive trust; and (iii) restitution, as Plaintiff cannot prove entitlement to these remedies under §17200.[1]

---

[1] None of the grounds upon which this motion is made require that any discovery be taken of Defendants or third parties. *See, e.g., Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1123 (9th Cir. 2018) (affirming dismissal of copyright claims due to lack of substantial similarity, and holding plaintiff not entitled to take discovery) ("Nothing disclosed during discovery could alter the fact that the allegedly infringing works are as a matter of law not substantially similar to [plaintiff's] photo.") (brackets added); *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 291 (S.D.N.Y. 2005) ("Because the relevant inquiry for summary judgment on the copyright and related claims regarding the movie focuses on the substantial similarities between Plaintiff's screenplay and Defendants' finished film, both of which are in evidence, the Court finds that there is sufficient evidence upon which to decide Defendants' motion for

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

1   This motion is made following the conference of counsel pursuant to Local

2   Rule 7-3, which took place on December 19, 2019.

3   The motion is based upon this Notice of Motion and Motion, the attached

4   Memorandum of Points and Authorities,[2] the Statement of Uncontroverted Facts and

5   Conclusions of Law, the Declarations of Elizabeth Schilken and Randall Jackson,

6   the Request for Judicial Notice, the Notice of Lodging, and all exhibits thereto, the

7   Proposed Judgment, all records, pleadings and papers on file herein, and upon such

8   further oral argument and/or documentary evidence as may be presented prior to or

9   at the hearing on this motion.

10

DATED:  January 13, 2020                 Louis P. Petrich
11                                        Elizabeth L. Schilken
                                          BALLARD SPAHR LLP
12

13                                        By:  ____/s/ Elizabeth L. Schilken_____
                                               Elizabeth L. Schilken
14                                        Attorneys for Defendants
                                          BOB WEINSTEIN, LIONS GATE
15                                        ENTERTAINMENT CORP., and
                                          BLUMHOUSE PRODUCTIONS, LLC
16

17

18

19

20

21

22

23

24

25   _____

26   partial summary judgment and that Plaintiff does not require additional discovery to
     enable her to respond").

27   [2] On January 6, 2020, the Court issued an Order (Dkt. #224) permitting Defendants
28   to file a Memorandum not to exceed 35 pages in support of the Motion.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ......................................1

I.   INTRODUCTION ...........................................................................1

II.  STATEMENT OF FACTS AND PROCEDURAL BACKGROUND......2

A.   The History of the Amityville House ...................................2

B.   Jay Anson Writes *The Amityville Horror: A True Story* Based on the Accounts of George and Kathy Lutz ................3

C.   In 1979, a Motion Picture Entitled *The Amityville Horror* Is Released Based on Anson's Book ............................5

D.   In 2017, Defendants Release a Motion Picture Featuring the 'Amityville House,' Entitled *Amityville: The Awakening* ................5

E.   Plaintiff Files Suit Against Defendants Alleging Copyright Infringement, False Advertising and Unfair Competition..............6

F.   Plaintiff Serves Discovery Responses Regarding Her Copyright, Lanham Act and Unfair Competition Claims ............6

III. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON EACH CLAIM IN THE FAC................8

A.   Legal Standard for Summary Judgment and Partial Summary Judgment....................................8

B.   Defendants Are Entitled to Judgment as a Matter of Law on Plaintiff's Claims for Copyright Infringement, Contributory Copyright Infringement, and Vicarious Copyright Infringement ................9

1.   Legal Standard for Copyright Infringement Claims ............9

2.   As a Matter of Law, Defendants' Movie *Amityville: The Awakening* Does Not Infringe Jay Anson's Book *The Amityville Horror: A True Story*; Because It Is Not Virtually Identical Or Substantially Similar to the Book................11

3.   Plaintiff's Contributory and Vicarious Copyright Infringement Claims Fall Alongside Her Direct Infringement Claim................27

4.   Plaintiff's Lanham Act False Advertising Claim Fails as a Matter of Law................27

5.   Plaintiff's California Unfair Competition Claims (§17200 and Common Law) Fail as a Matter of Law ........30

IV.  CONCLUSION................35

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agence France Presse v. Morel*,
769 F.Supp.2d 295 (S.D.N.Y. 2011) .................................................. 30

*Allen v. Acad. Games League of Am., Inc.*,
89 F.3d 614 (9th Cir. 1996) ................................................................ 10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ......................... 9

*Arica Inst., Inc. v. Palmer*,
970 F.2d 1067 (2d Cir. 1992) ....................................................... 13, 15

*Baden Sports, Inc. v. Molten USA, Inc.*,
556 F.3d 1300 (Fed. Cir. 2009) .......................................................... 30

*Berkic v. Crichton*,
761 F.2d 1289 (9th Cir. 1985) ...................................................... 11, 19

*Bower v. AT&T Mobility, LLC*,
196 Cal.App.4th 1545 (2011) ............................................................ 33

*Cavalier v. Random House, Inc.*,
297 F.3d 815 (9th Cir. 2002) ............................................................. 24

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ....................... 9

*City Solutions v. Clear Channel Communs., Inc.*,
365 F.3d 835 (9th Cir. 2004) ............................................................. 34

*Cleary v. News Corp.*,
30 F.3d 1255 (9th Cir. 1994) ............................................................. 31

*Dastar v. Twentieth Century Fox Film Corp.*,
539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003) ...........2, 27, 28, 29, 30

*Davies v. Bowes*,
209 F. 53 (S.D.N.Y. 1913), *aff'd*, 219 F. 178 (2d Cir. 1914) ............... 12

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

*Dyson, Inc. v. Garry Vacuum, LLC*,
  2010 U.S. Dist. LEXIS 153468 (C.D. Cal.) ............................................... 2, 34, 35

*Eldred v. Ashcroft*,
  537 U.S. 186, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) ................................. 11, 15

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
  499 U.S. 340, 113 L.Ed.2d 358, 111 S.Ct. 1282 (1991) ................................ 2, 11

*Flaherty v. Filardi*,
  388 F. Supp. 2d 274 (S.D.N.Y. 2005) ........................................................... 2

*Friedman v. Zimmer*,
  2015 WL 6164787 (C.D. Cal.) ..................................................................... 30

*Funky Films, Inc. v. Time Warner Entm't Co. L.P.*,
  462 F.3d 1072 (9th Cir. 2006) ...................................................................... 11

*Harper & Row, Publishers, Inc., v. Nation Enterprises*,
  471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). ............................... 11, 20

*Hoehling v. Universal City Studios, Inc.*,
  618 F.2d 972 (2d Cir. 1980) ......................................................................... 15

*Houts v. Universal City Studios, Inc.*,
  603 F.Supp. 26 (C.D. Cal. 1984) ................................................... 12, 13, 14, 15

*Hughes v. Fox Broadcasting Co.*,
  2007 WL9717762 (W.D. Mo. 2007) ............................................................. 12

*Huie v. National Broadcasting Co.*,
  184 F. Supp. 198 (S.D.N.Y. 1960) ............................................................... 12

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal.4th 1134 (2003) ........................................................................... 31, 32

*Kouf v. Walt Disney Pictures & Television*,
  16 F.3d 1042 (9th Cir. 1994) ........................................................................ 20

*Kwikset Corp. v. Superior Court*,
  51 Cal.4th 310 (2011) ........................................................................ 32, 33, 34

*Lake v. Columbia Broadcasting System, Inc.*,
  140 F.Supp. 707 (S.D. Cal. 1956) ................................................................ 12

*Landsberg v. Scrabble Crossword Game Players, Inc.*,
   736 F.2d 485 (9th Cir. 1984), *cert. denied*, 469 U.S. 1037 (1984) ...................... 15

*Litchfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) ....................................................................... 19, 27

*Madrid v. Perot Sys. Corp.*,
   130 Cal.App.4th 440 (2005) ................................................................................ 31

*Micro/Sys, Inc. v. DRS Technologies, Inc.*,
   2015 WL 12748631 (C.D. Cal.) .......................................................................... 29

*Narell v. Freeman*,
   872 F.2d 907 (9th Cir. 1989) ...................................................... 10, 15, 16, 26

*Nash v. CBS, Inc.*,
   691 F.Supp. 140 (N.D. Ill. 1988) ........................................................................ 12

*Nester's Map & Guide Corp. v. Hagstrom Map Co.*,
   796 F.Supp. 729 (E.D.N.Y. 1992) ...................................................................... 12

*Oliver v. Saint Germain Foundation*,
   41 F.Supp. 296 (S.D. Cal. 1941) ................................................................... 14, 15

*Olson v. National Broadcasting Co.*,
   855 F.2d 1446 (9th Cir. 1988) ............................................................................ 26

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ............................................................................ 27

*Prince v. Universal Music Corp.*,
   2009 WL 10672282 (C.D. Cal.) ......................................................................... 29

*Rentmeester v. Nike, Inc.*,
   883 F.3d 1111 (9th Cir. 2018) ......................................................... 2, 9, 10, 11

*Rice v. Fox Broadcasting Co.*,
   330 F.3d 1170 (9th Cir. 2003) ..................................................................... 20, 31

*Sybersound Records, Inc. v. UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) ...................................... 2, 28, 29, 30, 31

*Urantia Foundation v. Maaherra*,
   114 F.3d 955 (9th Cir. 1997) ...................................................................... 13, 15

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

*Van Patten v. Vertical Fitness Group, LLC*,
   847 F.3d 1037 (9th Cir. 2017) ................................................................. 33

**Statutes**

15 U.S.C. §1125(a)(1)(A) ...................................................................... 27, 29

17 U.S.C. § 102(b) ....................................................................................... 24

Cal. Bus. & Prof. Code §§17200, *et seq.* ......................................... 2, 6, 30

Cal. Bus. & Prof. Code, §§17204 ...................................................... 33, 34

Cal. Bus. & Prof. Code §§17500, *et seq.* ...................................... 6, 31, 33

Copyright Act Section 106(2) ..................................................................... 10

Lanham Act (15 U.S.C. §1125(a)(1)(B)) ..................................... 1, 2, 6, 28

Lanham Act Section 43(a)(1)(A) ........................................................ 27, 28

**Other Authorities**

37 C.F.R. §202.1(a) ..................................................................................... 18

Federal Rules of Civil Procedure Rule 56 ........................................... 1, 8, 9

Local Rule 7-3 ................................................................................................ 3

Local Rule 56 ............................................................................................. 1, 9

1 M. & D. Nimmer, *Nimmer on Copyright* §2.11[C] (Matthew Bender,
   Rev. Ed. 2019) ................................................................................... 14, 15

4 M. & D. Nimmer, *Nimmer on Copyright* §13.03[A][4] (Matthew
   Bender, Rev. Ed. 2019) ..................................................................... 14, 15

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Lions Gate Entertainment Corp. ("Lionsgate"), Blumhouse Productions, LLC ("Blumhouse"), and Bob Weinstein (collectively, "Defendants") hereby submit this Memorandum in support of their Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment, against Plaintiff Lesia Anson's ("Plaintiff's") Fourth Amended Complaint ("FAC"):

## I.    INTRODUCTION

Plaintiff's lawsuit is based on the false premise that Defendants cannot lawfully create and/or distribute a horror movie about the infamous "Amityville house" without a license of rights in her late husband's book, even though the house actually exists; it was widely reported in the media to be haunted after a violent crime was committed there; the family who lived in the house after the crime publicly asserted at press conferences and otherwise that it was haunted; and the allegedly infringed book – which chronologically summarized these occurrences – has been sold to the entire world for decades as "a true story."  Plaintiff ignores long-established limitations on the scope of copyright protection, and thus her claims of copyright infringement, as well as her ancillary Lanham Act false advertising and unfair competition claims, must be dismissed.

Blumhouse and Bob Weinstein produced the 2017 motion picture entitled *Amityville: The Awakening*, a film based on the notorious house at 112 Ocean Avenue, Amityville, N.Y. that was the site of a mass murder in 1974 (the "Picture"). Plaintiff is the widow of Jay Anson, who wrote a book in 1977 entitled *The Amityville Horror: A True Story* (the "Book"), about the experiences of the Lutz family who moved into the house in 1975 and abandoned it shortly afterward, claiming it was haunted.

Plaintiff contends that because the Picture and Book both contain certain <u>factual</u> details about the Amityville house and its history, Defendants have infringed on the copyright in the Book.  However, "[t]he most fundamental axiom of

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

copyright law" is that facts are not protected by copyright.  *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 US 340, 344-345 (1991).  Any commonalities between the Book and Picture that consist of <u>facts</u> regarding the "Amityville house" or the Lutzes' claims of haunting do not support her infringement claim.  Nor can Plaintiff rely on any commonalities that involve elements of *The Amityville Horror: A True Story* that were reported by Anson's Book as fact, but which she now claims are fictional.  The doctrine of copyright estoppel prevents an author who holds his work out as a "True Story," no matter how unlikely that story may seem, from later claiming in an infringement action that details were fictionalized.  Because there exists no virtual identity between the Book and the Picture, or in the alternative, substantial similarity between the protectable expression in the two works, Plaintiff's copyright claims fail as a matter of law.

Plaintiff's remaining claims fare no better.  Her Lanham Act §43(a)(1)(B) claim, alleging that Defendants committed false advertising by misrepresenting the Picture's licensing status, fails because, under controlling Ninth Circuit precedent, such statements cannot as a matter of law bear on the Picture's "nature, characteristics, [or] qualities."  Plaintiff's claims for unfair competition (California statutory and common law) fail because (1) they are substantially congruent with her Lanham Act claim, and must therefore fail on the same basis; (2) as to the Cal. Bus. & Prof. Code §17200 claim, she cannot prove she suffered an injury in fact, and lost money or property, due to Defendants' alleged false advertising; and (3) as to the common law claim, allegations regarding false advertising do not state a valid claim for relief.  For these reasons, Defendants are entitled to summary judgment.

## II.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

### A.    The History of the Amityville House

The so-called "Amityville house," a three-story Colonial at 112 Ocean Avenue in Amityville, N.Y., is infamous as the site of the 1974 murders of the DeFeo family.  Statement of Uncontroverted Facts ("SUF"), ¶7.  In November 1974,

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

Ronald DeFeo Jr. murdered his parents and four siblings by shooting them with a high-powered rifle as they lay in their beds.  He was later convicted on six counts of second-degree murder and sentenced to six consecutive life terms in prison.  SUF, ¶7; Declaration of Elizabeth Schilken ("Schilken Decl."), ¶12, Ex. J.  His lawyer claimed that "voices" in the house told him to murder his family.  Schilken Decl., ¶12, Ex. J; ¶14, Ex. L.

The DeFeos' house was purchased in 1975 by George and Kathy Lutz, a newly married couple who moved into the home in December 1975 with Kathy's three children from an earlier marriage.  SUF, ¶8; Schilken Decl., ¶¶7-8, Exs. E-F.  Twenty-eight days later, in January 1976, they abandoned the house, leaving behind all their belongings.  *Id.*  They claimed to witness supernatural/paranormal activity in the house, and that the house was occupied by an evil psychic force.  *Id.*

**B.    Jay Anson Writes *The Amityville Horror: A True Story* Based on the Accounts of George and Kathy Lutz**

In 1977, Jay Anson wrote and Prentice Hall published the book *The Amityville Horror: A True Story*, a purportedly <u>factual</u> story describing how the Lutzes were tormented by supernatural phenomena during their 28 days at the Amityville house.  SUF, ¶¶1, 10-11.  The words "a true story" are written in large red letters on the cover.[3]  SUF, ¶3.  In the Book's Afterword, <u>Anson writes and represents to the public</u>:

> To the extent that I can verify them, **all the events in this book are true**. … **There is simply too much independent corroboration of**

_____

[3] In written discovery, Plaintiff denied a request asking her to admit the authenticity of a copy of the cover of her husband's Book, despite the fact that the original book cover is well known and almost certainly well known to her.  Schilken Decl., ¶20, Exs. R-1, R-2 (Plaintiff's Responses to Lionsgate's First Set of Requests for Admission, No. 1).  She claimed to lack personal knowledge sufficient to enable her to respond.  She gave a similar response to an RFA asking her to admit the authenticity of her husband's Afterword for the Book.  *Id.* (Response to RFA No. 2).  Despite her bad-faith refusal to admit these RFAs, the authenticity of the Afterword and Book cover is not subject to reasonable dispute and may be judicially noticed.  *See* Request for Judicial Notice, ¶4.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

**their narrative to support the speculation that [George and Kathy Lutz] either imagined or fabricated these events.**

SUF, ¶6.  A priest, the Rev. John Nicola, wrote the Preface for the book, attesting to its accuracy:

**If the story were fiction, it would easily be dismissed as irrelevant.  It is, however, a documentary told by the family and the priest who actually experienced what is reported.**

SUF, ¶5.  On the back cover, reviewers are quoted saying the Book is especially terrifying because it tells a true story.  A *Houston Chronicle* reviewer says it is "Far more unsettling than fictional works such as The Exorcist" and a *Los Angeles Times* reviewer says it is "The scariest true story I have read in years…".  Schilken Decl., ¶3, Ex. A-1, Notice of Lodging, Ex. A-1. (Book, back cover).  In 1977, Anson gave an interview to the New York *Times* stating his work was factual: "These are the facts. This is what happened to the family….This was actually happening to someone."  Anson went on to tell the *Times*, "This was ***not*** an 'Exorcist' or an 'Omen,'" referring to two popular fictional movies about the supernatural.  Schilken Decl., ¶10, Ex. H (emphasis added).

Anson's claim that the Lutzes' story was true helped make the Book an instant sensation.  The Book made the New York Times Bestsellers List in the "Nonfiction" category and stayed there for 40 weeks.  Schilken Decl., ¶11, Ex. I; *see* FAC, ¶6 (describing the Book as a bestseller).  Numerous reviewers described the Book as a factual account.  Schilken Decl., ¶9, Ex. G.  Anson's claims of truthfulness prompted other journalists to investigate the Lutzes' account and publish their own conclusions as to the work's veracity (or lack thereof).  Schilken Decl., ¶12, Ex. J.  To this day, the Book is shelved with nonfiction books in the Los Angeles Public Library system.  Schilken Decl., ¶15, Ex. M-1.  It is also described to this day by commercial booksellers such as amazon.com as a true story.  Schilken Decl., ¶15, Ex. M-2.

**C.     In 1979, a Motion Picture Entitled *The Amityville Horror* Is Released Based on Anson's Book**

In 1979, American International Pictures ("AIP") released a motion picture entitled *The Amityville Horror* based on Anson's book, starring James Brolin, Margot Kidder and Rod Steiger.  FAC, ¶26; Schilken Decl., ¶22, Ex. T.  A motion picture remake, also based on the Book, was released by Metro-Goldwyn-Mayer Studios Inc. ("MGM") in 2005 under the same title, starring Ryan Reynolds, Melissa George and Philip Baker Hall.  FAC, ¶28; Schilken Decl., ¶22, Ex. T.

Numerous additional motion pictures not licensed by Plaintiff have been released relating to the Amityville haunting.  Schilken Decl., ¶16, Ex. N; ¶19, Ex. Q (Plaintiff's Responses to Lionsgate's First Set of Requests for Production, No. 8); ¶20, Ex. R-2 (Plaintiff's Responses to Lionsgate's First Set of Requests for Admission, No. 11), ¶21, Ex. S.  Over the 40 years between the release of the 1979 motion picture and the present day, twenty-plus horror films have been released with the word "Amityville" in the title.  Schilken Decl., ¶16, Ex. N.

**D.     In 2017, Defendants Release a Motion Picture Featuring the 'Amityville House,' Entitled *Amityville: The Awakening***

In October 2017, The Weinstein Company, LLC, headed by Bob Weinstein, released for public exhibition in theaters a motion picture entitled *Amityville: The Awakening*, starring Jennifer Jason Leigh, Bella Thorne, and Cameron Monaghan.  Declaration of Randall Jackson ("Jackson Decl."), ¶3, Ex. V (DVD copy of Picture); Notice of Lodging, ¶2, Ex. V.[4]  The movie tells the fictional story of a teen-age girl named Belle whose family moves into the infamous "Amityville house" at 112

---

[4] Blumhouse produced the Picture, and Lionsgate allegedly distributed the Picture on home video in the U.S.  As to the latter, Lionsgate has informed Plaintiff (e.g., Dkt. #131, p. 1, n.1) that it is not a proper party to this lawsuit.  However, solely for purposes of this Motion, Lionsgate will assume that the factual allegations made by Plaintiff with regard to Lionsgate are true.  For clarity and for the avoidance of doubt, Lionsgate expressly reserves its right to raise this defense at a later time.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

Ocean Avenue in Amityville, N.Y., so they can be closer to medical facilities that are treating her comatose brother James.  After moving in, Belle learns about the murders of the DeFeo family and the reports that the house is haunted.  When James mysteriously starts to recover from his injuries, Belle suspects that the evil spirits in the house have possessed her brother.  *Id.*

### E.     Plaintiff Files Suit Against Defendants Alleging Copyright Infringement, False Advertising and Unfair Competition

On November 15, 2017, Plaintiff Lesia Anson, the widow of Jay Anson, filed this lawsuit against Defendants claiming their 2017 film *Amityville: The Awakening* infringes the copyright in her late husband's book, *The Amityville Horror: A True Story*.  Complaint (Dkt. #1), p. 1, ¶56.  Plaintiff's FAC, filed in April 2019, asserted claims for 1) copyright infringement; 2) contributory copyright infringement; 3) vicarious copyright infringement; 4) violation of Lanham Act (15 U.S.C. §1125(a)(1)(B)); 5) violation of Calif. Bus. & Prof. Code §§17200, *et seq.* and 17500, *et seq.*, and California common law unfair competition; and 6) declaratory relief.  (Dkt. #161), p. 1.  The Sixth Claim for Declaratory Relief was dismissed by the Court without leave to amend on June 13, 2019.  (Dkt. #189).

### F.     Plaintiff Serves Discovery Responses Regarding Her Copyright, Lanham Act and Unfair Competition Claims

Plaintiff's Third Amended Complaint ("TAC") pleaded that Defendants falsely advertised their Picture by misrepresenting that it was "*a legitimate sequel* to the Derivative Amityville Horror Films based on the Novel.*"  TAC, ¶49.[5]   On March 25, 2019, Plaintiff served her Amended Responses to Blumhouse's First Set of Special Interrogatories, in which she stated that the term "legitimate sequel," as used in the TAC, referred to:

> … __an authorized sequel to__: the 1979 film *The Amityville Horror* (the "1979 Film")[] based on the Novel, the 2005 remake film *The*

---

[5] She made identical allegations in the operative Fourth Amended Complaint, ¶51.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

*Amityville Horror* (the "2005 Film") based on the Novel[,] and/or ***the Novel***, and … an authorized continuation of the branded *Amityville Horror* film franchise based on the Novel, and therefore of comparable quality to the Novel, the 1979 Film, the 2005 Film and the *Amityville Horror* film franchise, ***and such authorization would inherently entail the license or assignment of motion picture sequel rights to the underlying Novel***, and to the extent that Defendant's Sequel used elements from the 1979 Film and/or the 2005 Film that are not contained in the Novel, additional motion picture sequel rights to the 1979 Film and/or 2005 Film as applicable.

SUF, ¶19 (emphasis added); *see* SUF, ¶20.

On May 24, 2019, Plaintiff served her Amended Responses to Lionsgate's First Set of Interrogatories.  In response to an interrogatory asking her to identify all alleged similarities between the Book and Picture, she stated they were listed in Paragraph 58 of the FAC.  Schilken Decl., ¶18, Ex. P (Plaintiff's Amended Responses to Lionsgate's First Set of Interrogatories, No. 14).  In response to an interrogatory asking her to "state all facts" supporting her claim that Defendants' alleged false advertising caused her injury, she stated that:

… Plaintiff's damages … are supported by the following: *Plaintiff's lost revenue from the licensing, granting, assigning, or otherwise economically exploiting her rights in the Novel*, due to the harm to the goodwill and value associated with the Novel and the *Amityville Horror* film franchise, as a result of the poor quality of the infringing Sequel that has become wrongfully associated with the Novel and the *Amityville Horror* film franchise.

SUF, ¶25 (emphasis added).[6]  She stated that her calculation of this "lost revenue" depended on:

expert testimony, which would be based in part on: (a) a comparison of the revenue generated by the 1979 Film *The*

---

[6] Plaintiff also alleged that her damages included lost revenues she would have made from "licensing, granting, or assigning her rights in the Novel" to Defendants "for exploitation via the [2017 Picture]."  *Id.* (Response to No. 16) (brackets added).

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

> *Amityville Horror* based on the Novel … and the revenue
> generated by the infringing Sequel…; (b) a comparison of TWC,
> Blumhouse, Bob Weinstein, Harvey Weinstein, and Lionsgate's
> analysis of the market for and value of the Sequel … and the actual
> economic performance of the Sequel … ; (c) the factual allegations
> set forth in Paragraphs 36-37[7] of the [FAC], which allegations are
> incorporated herein by reference; (d) discovery from Defendants in
> this Action …; and (e) further expert opinion or analysis….

SUF, ¶26.  On May 24, 2019, Plaintiff served her Amended Responses to Lionsgate's First Set of Requests for Production.  She promised to produce all documents in her possession, custody or control reflecting any license or assignment of copyright rights in the 1977 Jay Anson book, granted by her or Jay Anson.  Schilken Decl., ¶19, Ex. Q (Response to RFP No. 8).  However, she never produced any documents reflecting any such licenses or assignments of motion picture rights, other than documents reflecting an assignment of motion picture rights to the predecessor-in-interest of AIP, which produced the 1979 film.  *Id.*

## III.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON EACH CLAIM IN THE FAC

### A.    Legal Standard for Summary Judgment and Partial Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure ("FRCP"), a party may move for summary judgment or partial summary judgment, "identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  A court shall grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FRCP 56(c) .

The moving party has the burden of demonstrating the absence of a genuine

---

[7] Alleging that Defendants' film *Amityville: The Awakening* "received dreadful reviews" and "suffered one of the worst opening weekends of all time, grossing only $742 from 10 theaters or an average of $74 per theater."  FAC, ¶¶36-37.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).  Rule 56(e) provides that "[w]hen a motion for summary judgment is made and supported … an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but … must set forth specific facts showing that there is a genuine issue for trial." *Id.*

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

**B.      Defendants Are Entitled to Judgment as a Matter of Law on Plaintiff's Claims for Copyright Infringement, Contributory Copyright Infringement, and Vicarious Copyright Infringement**

1.      Legal Standard for Copyright Infringement Claims

To prove a claim for copyright infringement, a plaintiff must establish that (1) she owns a valid copyright, and (2) the defendants copied protected aspects of the copyrighted work's expression.  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1116 (9th Cir. 2018).  The second element has two components: (a) copying, also known as actual copying, and (b) unlawful appropriation.  *Id.*  As the Ninth Circuit noted in *Rentmeester*:

> Proof of unlawful appropriation … is necessary because copyright law does not forbid all copying. The Copyright Act provides that copyright protection does not "extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in [the copyrighted] work." 17 U.S.C. § 102(b). Thus, a defendant incurs no liability if he copies only the "ideas" or "concepts" used in the plaintiff's work.

*Id.*  Unlawful appropriation occurs only if the defendants copy enough of the

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

expression of those ideas and concepts to render the two works "substantially similar." *Id.* at 1117.[8]

In the Ninth Circuit, substantial similarity is determined under a two-step analysis consisting of the "extrinsic test" and the "intrinsic test." *Id.* at 1117. A plaintiff must prove substantial similarity under both tests to prevail on her copyright claim. *Id.* "The extrinsic test assesses the objective similarities of the two works, focusing only on the protectable elements of the plaintiff's expression." *Id.* at 1118. Thus, a court must "filter out" the unprotectable elements of the plaintiff's work such as ideas, facts, public domain materials, and *scènes à faire*, which are "stock or standard features that are commonly associated with the treatment of a given subject." *Id.* at 1118; *Narell v. Freeman*, 872 F.2d 907, 913 (9th Cir. 1989). "The protectable elements that remain are then compared to corresponding elements of the defendant's work to assess similarities in the objective details of the works."[9] *Rentmeester*, 883 F.3d at 1118. When works such as novels and motion pictures are compared under the extrinsic test, the court looks for similarities with respect to plot, themes, dialogue, mood, setting, pace, characters, and sequence of events. *Id.* at 1119. The extrinsic test may be decided by a court as a matter of law. *Id.* This legal analysis is not changed where, as here, a plaintiff contends (e.g., FAC, ¶53) that the alleged infringer has infringed upon the derivative work rights conferred by Section 106(2) of the Copyright Act. *See Allen v. Acad. Games League of Am., Inc.*, 89 F.3d 614, 617 (9th Cir. 1996) ("Allen asserts that to constitute a derivative work, the infringing work need only incorporate in some form a portion of the copyrighted material. This court, however, has consistently held that to prove infringement, one must demonstrate substantial similarity between the works.").

---

[8] Moreover, as detailed herein, when the work alleged to be infringed is a factual work, the plaintiff must demonstrate an even higher level of similarity – "virtual identity" between the two works. *See* Section III.B.2.b., *supra*.

[9] The intrinsic test is a subjective comparison of the works to determine whether they are substantially similar in "total concept and feel." *Id.* at 1118.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

In sum, even where there is evidence of actual copying, no copying is actionable unless it involves a substantial taking of protectable expression. *Rentmeester*, 883 F.3d at 1124.  In the Ninth Circuit, when non-identical dramatic or literary works are compared, protectable expression means "the actual concrete elements that make up the total sequence of events and the relationships between the major characters" -- not basic plot ideas or a combination of abstract similarities. *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985); *accord, Funky Films, Inc. v. Time Warner Entm't Co. L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006).

2.   As a Matter of Law, Defendants' Movie *Amityville: The Awakening* Does Not Infringe Jay Anson's Book *The Amityville Horror: A True Story*; Because It Is Not Virtually Identical Or Substantially Similar to the Book

a.   *The Amityville Horror*, Which Represents on the Cover It Is a "True Story," Must Be Treated as a *Factual* Work Under the Doctrine of Copyright Estoppel and Given an Accordingly Narrow Scope of Protection

The U.S. Supreme Court in *Harper & Row, Publishers, Inc., v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985),[10] *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 349-350, 113 L.Ed.2d 358, 111 S.Ct. 1282 (1991), and *Eldred v. Ashcroft*, 537 U.S. 186, 219, 123 S.Ct. 769, 789, 154 L.Ed.2d 683, 711 (2003), explained that an author is given copyright protection for the expression in her work in return for publishing facts and ideas which anyone may use from the moment of publication.[11]  This "bargain" is enforced by the doctrine of copyright estoppel, which provides that when a plaintiff or her predecessor in interest holds out her work as nonfiction, she cannot, in a later copyright infringement action, claim the work is fictional and thus hold others liable

---

[10] 471 U.S. at 556 ("No author may copyright his ideas or the facts he narrates.").

[11] 537 U.S. at 219 ("every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication.") (*citing Feist*, 499 U.S. at 349-350).

for using the "facts" she reported.  *Houts v. Universal City Studios, Inc.,* 603 F.Supp. 26, 28 (C.D. Cal. 1984) (granting summary judgment against claim of infringement of nonfiction book); *accord*, *Hughes v. Fox Broadcasting Co.*, 2007 WL9717762, *9 (W.D. Mo. 2007) (citing *Houts*); *Nester's Map & Guide Corp. v. Hagstrom Map Co.*, 796 F.Supp. 729, 733 (E.D.N.Y. 1992) (citing *Houts*) ("To treat 'false' facts interspersed among actual facts and represented as actual facts as fiction would mean that no one could ever reproduce or copy actual facts without risk of reproducing a false fact and thereby violating a copyright."); *Nash v. CBS, Inc.*, 691 F.Supp. 140, 142 (N.D. Ill. 1988) (citing *Houts*).

In this lawsuit, Plaintiff, recognizing that a nonfiction book receives a narrower scope of copyright protection than a fictional one,[12] now declares that *The Amityville Horror: A True Story*  "is clearly a work of fiction."  FAC, ¶24.

However, copyright estoppel prevents Plaintiff from retracting Anson's representations to the public that the work was "A True Story."  *Houts,* 603 F.Supp. at 28; *accord*, *Huie v. National Broadcasting Co.*, 184 F. Supp. 198, 199–200 (S.D.N.Y. 1960) (rejecting claims of nonfiction author in copyright infringement case that some events in story were fictional) ("Plaintiff attempts to differentiate between truth and dramatic devices[,] but the word he used was 'true'… he is estopped to say that the episodes should be treated as fictitious."); *Lake v. Columbia Broadcasting System, Inc.*, 140 F.Supp. 707, 708 (S.D. Cal. 1956) (book on Wyatt Earp was treated as factual, and events therein were not protectable under copyright, when it was "declared in the preface to be an accurate historical biography … and 'in no part a mythic tale'."); *Davies v. Bowes*, 209 F. 53, 55 (S.D.N.Y. 1913), *aff'd,* 219 F. 178 (2d Cir. 1914) (plaintiff who wrote newspaper article as fact, "for the purpose of attracting attention and lending interest to an alleged

---

[12] Not only must facts be filtered out of any comparison of the plaintiff's and defendants' works under the extrinsic test, *see* Section III.B.1., but, where the plaintiff's work is considered a factual work, the defendants' work must be virtually identical in order to find infringement.  *See* Section III.B.2.b.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

occurrence which if told as fiction would have been tawdry and unconvincing," was estopped to later claim it was fictional) ("[H]e who puts forth a thing as verity shall not be heard to allege for profit that it is fiction."). "Numerous courts, on motions for summary judgment, have estopped plaintiffs from claiming that a work was fiction after they held it out as fact." *Houts*, 603 F.Supp. at 29.

In *Houts*, the author of a book about the Chief Medical Examiner of New York City sued the makers of the television show *Quincy* for copyright infringement. The hardcover book jacket stated it contained "real life detective stories"; the spine of a paperback edition contained the notation "N-F" for nonfiction; and the first page of the paperback stated "[h]ere is a book that shows that truth can be more brutal than fiction." *Id.* at 28. The plaintiff insisted parts of the book were fictional and entitled to a higher level of protection than the factual portions. But the Court held the entire work would be treated as factual:

> **The book jacket expressly holds the book out as being true.** If the statements "one of the most absorbing books on *true* crime ever published" and "truth can be more brutal than fiction" do not expressly hold the contents of the book out as true, then this Court is unaware of any situation in which an assertion could be deemed as being an express indication of a book's veracity…. These statements imply that *the entire book, not a portion of it,* is true.

*Id.* at 28, 29 (emphasis added).

The Court rejected the argument that parts of the book were so ludicrous nobody would believe they were true. "[T]he Court's inquiry is not whether the stories are true and believable or false and absurd[,] but whether the book was held out to the public as fact or fiction." *Id.* at 30; *accord*, *Urantia Foundation v. Maaherra*, 114 F.3d 955, 959 (9th Cir. 1997) ("revelations" in book supposedly authored by celestial beings were analogous to facts and "would not be copyrightable"); *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1075 (2d Cir. 1992) (copyright owner of book describing "enneagons," nine-pointed figures mapping the human psyche, represented that book contained scientifically verifiable facts and

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

was estopped from later arguing book was not factual) ("That a reasonable reader might not believe the representation does not negate the estoppel."); *Oliver v. Saint Germain Foundation*, 41 F.Supp. 296, 299 (S.D. Cal. 1941) (copyright owner of purportedly factual book containing revelations of spiritual being named "Phylos, the Thibetan" was estopped from later claiming work was not factual). "Given an express representation that the work is factual, the case law indicates that the author will be estopped from claiming fictionalization, even if most readers would not believe the representation." 1 M. & D. Nimmer, *Nimmer on Copyright* §2.11[C] (Matthew Bender, Rev. Ed. 2019) ("*Nimmer*").

It is beyond dispute that Jay Anson represented to the public that his Book was "A True Story" – the words are emblazoned in large red letters on the cover. *Houts*, 603 F.Supp. at 28, 29. He vouched for the Book's accuracy in the Afterword, and a priest wrote in the Preface that the story was a "documentary." Anson sold millions of copies of the Book because the public was transfixed by his "true" report of the haunting in Amityville. His work owes its success to his claims that it was factual, and Plaintiff is estopped to now claim any part of it is fictional. *Houts*, 603 F.Supp. at 28.

Plaintiff's Fourth Amended Complaint suggests that copyright estoppel does not apply because a reasonable person would know the Book is fictional:

> [T]he Novel is clearly a work of fiction, replete with fantastic literary creations (*e.g.*, room(s) which are the sources of evil, ceilings and walls oozing green slime, plagues of flies in the dead of winter, demonic possessions, people levitating and floating away, a young woman transformed into a toothless old hag and then back to her natural state, a child talking to the supernatural spirit form of an enormous flying pig with red eyes, etc.)

FAC, ¶24. Unfortunately for Plaintiff, the Book was billed <u>not</u> as a work of fiction but as a "True Story." Copyright estoppel applies regardless of whether a reasonable person would consider things like haunted houses and demonic

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

possessions as "fantastic literary creations" or as facts.  *Houts*, 603 F.Supp. at 30; *Urantia Foundation*, 114 F.3d at 959; *Arica Inst.*, 970 F.2d at 1075; *Oliver*, 41 F.Supp. at 299; *Nimmer*, §2.11[C].  Thus, the Book must be treated as factual. These facts became available from the moment of publication, *Eldred*, 537 U.S. at 219, and Plaintiff cannot unring the bell four decades later.

b.   Plaintiff Cannot Prove Her Infringement Claim Because the Book and Picture Are Not "Virtually Identical"

When the plaintiff's work is an historical or biographical work – i.e., a factual work – it is entitled only to "thin" copyright protection, and only a showing of similarity that is *virtually identical* will suffice.  *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 980 (2d Cir. 1980) (where plaintiff's work is factual, summary judgment should be granted for defendants where the two works "are not virtually identical"); *see Narell v. Freeman*, 872 F.2d 907, 910-911 (9th Cir. 1989) (factual elements in plaintiff's nonfiction book, incorporated into defendant's fictional romance novel, were not copyrightable) ("Historical facts and theories may be copied, as long as the defendant does not 'bodily appropriate' the expression of the plaintiff."); *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir. 1984), *cert. denied*, 469 U.S. 1037 (1984) ("[S]imilarity of expression may have to amount to verbatim reproduction or very close paraphrasing before a factual work will be deemed infringed."); *see* 4 *Nimmer* §13.03[A][4] at 13-70.2 ("[I]f substantial similarity is the normal measure required to demonstrate infringement, 'supersubstantial' similarity must pertain when dealing with works subject to only 'thin' protection.").[13]

As is evident from an examination of the two works, *Amityville: The Awakening* does not "bodily appropriate" protectable expression from *The*

_____

[13] *See also* 4 *Nimmer* §13.03[B][2] at 13-81 ("Because no copyright may exist in facts *per se*, the copyright in a book dealing with factual matters cannot be infringed by a work that copies such facts, but in a manner in which the particular verbal description of such facts is not copied.")

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

*Amityville Horror: A True Story*, and the works are not virtually identical.  Plaintiff cannot even demonstrate "substantial similarity," the <u>lower</u> standard involved in claims of infringement of a *non*-factual work.  *See* Section III.B.2.c., *supra*.

Plaintiff's discovery responses state that Paragraph 58 of the FAC identifies all similarities between the two works.  But nothing listed in ¶58 demonstrates bodily appropriation or virtual identity.  At most, Plaintiff identifies certain ordinary phrases that are used in both works ("Get out" and "What are you doing up?"); or certain factual details that have been used (odd smells in the house; the presence of a red room).  Duplicating factual elements and using "a few ordinary phrases" from Plaintiff's work does not constitute bodily appropriation of protected expression, as a matter of law.  *Narell*, 872 F.2d at 912 ("Freeman has taken facts and ordinary phrases from Narell, but she has not taken protected expression from Narell. A reasonable juror could not conclude that Freeman copied protected expression from Narell.").  Plaintiff's copyright infringement claim fails because the two works are not virtually identical.  *Id.*

         c.      Even if Anson's Book Were Evaluated Under the Substantial Similarity Standard, Plaintiff's Copyright Claim Would Fail

Even if *The Amityville Horror: A True Story* were evaluated under the lower standard of substantial similarity, Plaintiff's copyright infringement claim would still fail as a matter of law.  An examination of the two works under the extrinsic test (plot, sequence of events, characters, theme, dialogue, setting, mood and pace) establishes the works are not substantially similar.

         (i)      Plot and Sequence of Events

A review of the two works shows that their plots and sequences of events are <u>not</u> similar in their protected expression.  At best, they share the unprotectable general plot idea of a family's moving into a haunted house.  Any purported

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

similarities consist of unprotectable ideas, facts,[14] or scenes-a-faire.

Plot:

In Jay Anson's book *The Amityville Horror: A True Story*, George and Kathy Lutz, a recently married couple with three children (9-year-old Daniel, 7-year-old Chris, and 5-year-old Missy, from Kathy's earlier marriage) buy a home at 112 Ocean Avenue, Amityville, N.Y., that was the site of a gruesome multiple slaying of the home's former occupants only a year earlier in 1974. George and Kathy know about the murders before they buy the house, but they are unfazed because they are not superstitious. Immediately upon moving in, strange and disturbing things start to happen: Doors and windows open on their own; certain rooms are subject to cold spots and foul smells; hundreds of flies appear on a bedroom window in the middle of winter; George Lutz keeps waking up inexplicably at 3:15 a.m., the time of the murders of the DeFeo family. Visitors seem to sense something sinister in the house and leave quickly. A priest named Father Mancuso who blesses the house hears a voice tell him to "Get out!" even though no one is in the room. Over the 28 days the Lutz family lives in the home, these unexplained events become more violent and disturbing. Meanwhile, Father Mancuso is plagued by illnesses and other misfortunes that he believes are being inflicted on him by the evil forces in the house, and he refuses to visit again. The sinister events at the house increase in

---

[14] Any "fictional" elements of the Book that Plaintiff alleges were copied in the Picture must be treated as <u>facts</u> under the doctrine of copyright estoppel, Section III.B.2.a., *supra*, and filtered out of the substantial similarity analysis.

Furthermore, there are certain elements of *The Amityville Horror: A True Story* that Plaintiff cannot dispute are historical fact, even assuming (for the sake of argument only) that the doctrine of copyright estoppel does not apply and the Book is deemed partly fictional. Those indisputably factual elements include: the murders by Ronald DeFeo of six family members at 112 Ocean Avenue in Amityville, N.Y., in 1974; the Lutz family's (George, Kathy, Danny, Chris and Missy, and their dog Harry) moving into the house in December 1975, and moving out 28 days later; the layout/appearance of the house, including the quarter moon windows; and the fact the Lutzes claimed the house was haunted. *See* Request for Judicial Notice, ¶¶1-3.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

intensity and include:  a demon's shadow appearing in the living room fireplace; green slime oozing from the walls, Missy's telling her parents she talks to a giant pig named "Jodie", and the discovery of a secret room in the basement that has walls painted red and reeks of blood.  The next-to-last day at 112 Ocean Avenue, the Lutzes try to flee but are forced to spend another night there after their van will not start and powerful thunderstorms hit the area. After encountering a demonic apparition in the boys' room early the next morning, they abandon the home and all their belongings, never to return.

In Defendants' *Amityville: The Awakening*, widowed mother Joan Walker and her children – 17-year-old Belle, Belle's twin brother James, and 7-year-old Juliet – and the family dog Larry move into the house at 112 Ocean Avenue, Amityville, N.Y., in order to be closer to a neurological center that will treat James for his traumatic brain injury.  James suffered irreversible brain damage when he got in a fight over some leaked photos of Belle, and has been in a vegetative state for two years; but Joan is convinced that James will somehow recover.  Belle is unaware at first about their new house's violent past, until she starts to have terrifying visions – and grows suspicious at the fact that everyone at school knows where she lives.  She reads some news articles in the school library and learns about the DeFeo murders.  Then she is shown the cover of a DVD of the 1979 movie *The Amityville Horror* and realizes her home is infamous.[15]  James slowly starts to recover in the new home, opening his eyes, regaining consciousness and even using a computer monitor to communicate with his family.  But Belle learns that James is getting "better" only because his body has been possessed by evil spirits.  When Belle tells Joan this, she is shocked to learn that Joan has abandoned God and that she moved

---

[15] The Picture includes brief shots of the DVD covers for *The Amityville Horror* (both 1979 and 2005 versions), and *Amityville II: The Possession* (1982), as well as the cover of the Anson Book; and purports to briefly show a map of the house's basement that was inside the Book.  Plaintiff does not claim to own the copyright in any of the cover designs.  Literary titles are not copyrightable.  37 C.F.R. §202.1(a).

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

to the house hoping that another "power" (even an evil one) would save her son.
Later Joan knocks Belle unconscious to prevent her from fleeing the house.  That
night, Belle wakes up at 3:15 a.m., just as James gets out of bed and shuffles down
to the "red room" in the basement, which is supposed to be the source of all evil in
the house.  He places his hands on the wall, and in moments his body is completely
restored to what it was before the accident.  He picks up a shotgun and starts
stalking his family, killing his aunt Candice and mother Joan.  He tries to kill Juliet,
but Belle stops him by tackling him through a window.  They fall to the ground
outside, and Belle drags him outside the "bounding circle," a line in the grass that
was drawn around the house to contain evil spirits.  When he gets outside the
bounding circle, James' body shrivels and dies.  Later, we learn that police consider
Belle a "person of interest" in the murders of Joan and Candice.

The main similarity between *The Amityville Horror: A True Story* and
*Amityville: The Awakening* is they both involve the idea of a family's moving into a
haunted house and being tormented by evil spirits.  Such "similarities in plot exist
only at the general level for which plaintiff cannot claim copyright protection."
*Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984); *see also Berkic v.
Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) ("At a very high level of generality,
the works do show a certain gruesome similarity.  Both deal with criminal
organizations that murder healthy young people, then remove and sell their vital
organs to wealthy people in need of organ transplants. … But this degree of
similarity between the basic plots of two works cannot sustain a plaintiff's claim
that the works are 'substantially similar.'  No one can own the basic idea for a
story.").  Moreover, this "plot" element must be considered an unprotectable fact
due to the application of copyright estoppel.  *See* Section III.B.2.a., *supra.*

Another similarity between *The Amityville Horror: A True Story* and
*Amityville: The Awakening* is that they share a backstory – in both works, it is
explained that the house at 112 Ocean Avenue in Amityville, N.Y. was the site of

the murder of DeFeo family members by Ronald DeFeo in 1974.  But this element is unprotectable because it is a fact.  *Harper & Row, Publishers v. Nation Enterprises*, 471 U.S. 539, 547, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) ("no author may copyright facts or ideas").  The presence of the "red room" in the house in both works is likewise unprotectable because it is a fact; as is the protagonists' waking up at 3:15 a.m.  *See* Section III.B.2.a., *supra.*  Beyond these unprotectable elements, the works are dissimilar.

Sequence of events:

The sequence of events in the two works is similar only in that each work follows the familiar pattern of <u>all</u> "haunting" movies: Family occupies haunted place; strange/disturbing things start happening; the family tries to escape the haunted place but is prevented from leaving (e.g., *Poltergeist*, *The Shining*).  Apart from tracking that clichéd pattern, which is a scene-a-faire, the two works have different sequences of events.

(ii)    Characters

The characters in the two works are vastly different.  The only similarity is that both works feature families with three children; and that each family has a dog; however, generalized "character types" like this are not protected by copyright law. *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003); *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1046 (9th Cir. 1994).  Moreover, the element of a family with three children and a dog is unprotectable because it is an undisputed **fact** the Lutz family, at the time they occupied the house at 112 Ocean Avenue, had three children and a dog.  Facts are not protectable.  *Harper & Row, Publishers*, 471 U.S. at 547.

George Lutz (*The Amityville Horror*)

George Lutz is a professional surveyor, the husband of Kathy, and stepfather to her three children from an earlier marriage.  Although he and Kathy are the main protagonists in *The Amityville Horror*, there is no analog for George in the Picture.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

<u>Belle Walker (*Amityville: The Awakening*)</u>

Belle Walker, 17, is the troubled twin sister of James Walker and the protagonist of *Amityville: The Awakening*.  Belle's mother Joan blames her for James' traumatic brain injury, as James fell from a balcony while fighting another boy who had humiliated Belle.  Belle believes James will never recover.  Belle ends up killing James to save Juliet's life and to free James' body from the evil spirits. There is no analog to Belle in *The Amityville Horror*.

<u>Kathy Lutz (*The Amityville Horror*)</u> / <u>Joan Walker (*Amityville: The Awakening*)</u>

In Anson's Book, Kathy Lutz, wife to George and mother to Danny, Chris and Missy, is tormented by the spirits at 112 Ocean Avenue.  She feels herself being "embraced" by invisible beings; she has nightmares of violence; she levitates in her bed; she smells foul smells; she sees objects that have been mysteriously moved out of place; she sees a demonic shadow figure in the fireplace.  Her usual reaction to these frightening things is to scream or cry.  By the end of the book, she is telling George that the family should abandon the house.

In Defendants' Picture, Joan Walker, the widowed mother of Belle, James and Juliet, seems unconcerned with any supernatural phenomena at 112 Ocean Avenue – until the end of the movie, when her possessed son James stalks and shoots her.  Joan, who has given up on God, has chosen to move into the Amityville house in the hopes that some "power" (even an evil one) can save her comatose son. She brains Belle with the butt of a shotgun rather than let her flee the house.

Other than the unprotectable fact they are both mothers of three children, Kathy and Joan are completely different.

<u>Danny and Chris (*The Amityville Horror*)</u> / <u>James Walker (*Amityville: The Awakening*)</u>

In Anson's Book, Danny, 9, and Chris, 7, are not described in much detail, other than they are typical rough-and-tumble young boys.  They discover mysteriously blackened toilet bowls in the bathrooms; they are exposed to drafts

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

when the windows open on their own; Danny gets his hand slammed in a window trying to close it; George has a vision that Chris is being lifted out of bed by a demonic shadow figure; and the boys encounter a shadow demon the last night in the house.  Danny and Chris flee the house with their family.

In Defendants' Picture, James Walker, 17, has been in a comatose state for two years when his family moves in to their new home.  He has irreversible brain damage, but suddenly appears to start recovering from his injury.  His sister Belle learns that James' body has been possessed by evil spirits.  Eventually James is strong enough to go to the red room, where he places his hands on the walls and, by absorbing its evil energy, regains his old strength.  He shoots his mother Joan and his aunt Candice, and tries to shoot Juliet before Belle kills him.

Danny and Chris share no similarities with James.

Missy (*The Amityville Horror*) / Juliet (*Amityville: The Awakening*):

In Anson's Book, Missy, 5, is seen by her mother humming to herself and acting strangely.  She asks her mother, "Do angels talk?"  She tells everyone she has a friend that only she can see, an enormous pig named Jodie who talks to her.  Jodie tells her she can stay in the house forever to play with the spirit of a little boy who used to live there.  Missy later draws a picture of Jodie for her family.

In Defendants' Picture, Juliet, 7, says she "talks" with her comatose brother James.  She asks Belle if James ever talks to her, and Belle says "I guess, in a way," then Juliet asks Belle, "Does he use bad words?", a sign that evil spirits have already possessed James.  She tells Belle one morning that James fixed her cereal, just before a demonic vision of James appears to Belle in a mirror.  Later, Juliet sees a demonic looking James hiss at her in a closet.  At the end of the movie, James tries to shoot Juliet, but Belle kills him.

The only similarity Plaintiff identifies between these two characters is that both are young girls who can communicate with supernatural beings (Missy with Jodie and Juliet with the spirits possessing her brother).  However, this element must

be considered an unprotectable fact under the doctrine of copyright estoppel. *See* Section III.B.2.a., *supra.* Further, this very generalized similarity exists only as an abstract idea, which is not protectable.

Even if it is not deemed as fact under the doctrine of copyright estoppel, having a young child communicate with spirits is a cliché of the haunted house genre. Examples of young children in the movies who communicate with the supernatural: Carol Anne Freeling in *Poltergeist*, who converses with spirits through her family's television set; Danny Torrance from *The Shining*, who is spoken to by the ghost twins in the Overlook Hotel; Regan MacNeil in *The Exorcist*, who becomes possessed after playing with a Ouija board and contacting a supposedly imaginary friend named Captain Howdy; and *The Sixth Sense*'s Cole Sear (of "I see dead people" fame). *See* https://en.wikipedia.org/wiki/Poltergeist_(1982_film)*; https://en.wikipedia.org /wiki/The_Shining_(film)*; https://en. wikipedia.org/wiki/ The_Exorcist_(film); https://en.wikipedia.org/wiki/ The_Sixth_Sense*. Having a little girl character who talks to supernatural beings is an unprotectable scene-a-faire.

Father Frank Mancuso (*The Amityville Horror*) / Dr. Ken Milton (*Amityville: The Awakening*)

In Anson's Book, Father Mancuso is a Catholic priest who, at the request of Kathy Lutz, comes to bless her new home at 112 Ocean Avenue. He hears a mysterious voice tell him to "get out" while performing the blessing. After he leaves the house, he is plagued by numerous illnesses and other misfortunes. He wants to help the Lutzes but is too afraid to return to the house.

In Defendants' Picture, Dr. Ken Milton is a doctor who is treating James Walker. He hooks James up to an EEG and discovers that James has regained consciousness. When he is alone with James, Dr. Milton discovers a huge open sore on James' back, with flies swarming around it. The swarm attacks Dr. Milton and goes down his throat, but when Belle walks into the room, the illusion disappears

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

and Dr. Milton leaves hastily: "I don't think I can do any more for you."

The only similarity the two men share is they are guests at the house who experience terrifying supernatural events and do not return – a natural reaction for anyone visiting the most legendary haunted house of all time. This highly generalized characteristic is an unprotectable idea.

### Candice (*Amityville: The Awakening*)

In Defendants' Picture, Candice is Joan's sister and the children's aunt. Her profession isn't made clear, but she appears to be a nurse. She is killed by James at the end of the movie. There is no analog to Candice in Anson's Book.

### Terrence and Marissa (*Amityville: The Awakening*)

In Defendants' Picture, Terrence and Marissa befriend Belle at her new high school, and the three teenagers discuss the strange goings-on at Belle's house. Terrence and Marissa come over to Belle's house one night to watch the 1979 movie *The Amityville Horror*. There are no analogs to Terrence and Marissa in the Book.

### Harry (*The Amityville Horror*) and Larry (*Amityville: The Awakening*)

Both works feature family dogs who react to the supernatural forces in the house. In the Book, Harry occasionally barks for no apparent reason and at other points acts lethargic, sleeping constantly. The Lutz family takes Harry with them when they finally escape the house. In Defendants' Picture, Larry at one point barks for no apparent reason, is later found dead floating by the boat dock, and at the end of the film, is reanimated as a vicious attack dog who is killed by Belle. Other than the unprotectable (as fact) element that both dogs are depicted barking for no apparent reason, there are no similarities between the two.

### (iii)   Themes

Themes are ideas and ideas are not protectable in themselves. 17 U.S.C. §102(b); *see Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002) ("Familiar stock scenes and themes that are staples of literature are not protected.").

*The Amityville Horror*

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

A theme of Anson's Book is that there are dark and unknowable forces in this world that should not be trifled with.  The Lutz family knows about the DeFeo murders yet buys the house anyway.  Even after it becomes clear that something is seriously wrong, they stay and endure more of the "Amityville horror" because George (at first) doesn't believe in ghosts.

*Amityville: The Awakening*

A theme of Defendants' 2017 film is that refusing to accept the death or incapacity of a loved one can have terrible consequences. Joan Walker refuses to accept that James has irreversible brain damage and relies on the house's powers to save him, but they drive him to murder Joan and Candice.  A related theme is that loving someone can mean having to let them go.  Belle misses James, but knows he is never going to recover and it would be best if he were to die instead of being kept alive unnaturally.  The themes of the two works are not similar.

(iv)   Dialogue

The only similarities in dialogue identified by Plaintiff are the following:

- **The book:** Kathy is in the kitchen one morning and feels someone staring at her. She turns around and sees Missy.  She says, "Missy! You scared me half to death.  What's the matter? What are you doing up so early?"  **The 2017 film:**  While trying to close a window at night, Belle turns around and sees Juliet standing behind her.  She says, "Juliet, you can't just sneak up on people like that." Juliet says, "Sorry."  Belle opens James' door and checks on him, then closes it.  She asks Juliet, "What are you doing up?""

- **The book:** Kathy's aunt visits the house and tells her, "There's something bad in here, Kathy."  **The 2017 film:**  Toward the end of the film, Belle tells her mother, "This house is evil. This house is really bad!"

- **The book:** Father Mancuso hears a voice saying "Get out!" when he blesses the house. **The 2017 film:**  When James is possessed by evil spirits, he spells "GET OUT GET OUT GET OUT" on his monitor.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

Use of the word "bad" to describe a house, the question "What are you doing up?" and the phrase "Get out" are not protectable under copyright.  Words and short phrases cannot be copyrighted.  *See Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) (plaintiff's copyright was not infringed by defendant's use of phrases "rekindle old memories," "staggering network," "river wound its way between muddy banks crawling with alligators," "hordes of gold seekers," "pitched overboard," "cow path," "shanties and corrugated [iron/steel] shacks ... were crowded together," and "beach was strewn with boxes, bales.").

Even if these three words/short phrases were protectable – and they are not – they comprise such a miniscule portion of Anson's Book (and Defendants' Picture) that any inclusion of them in the Picture would be de minimis.

(v)   Setting

The setting in *The Amityville Horror* is the mid-1970s at 112 Ocean Avenue, Amityville, N.Y.  The setting in *Amityville: The Awakening* is modern day at the same location.  Thus, both works share the same geographical (although not temporal) setting.  However, the location of the house is an unprotectable fact.  Similarly, the appearance and layout of the house, with its "quarter moon" windows, "red room" and "high hopes" sign, are unprotectable facts.

(vi)   Mood

The mood in both works is sinister and foreboding, but that is a stock element of the haunted house genre.  Similarities of mood that are "common to [a] genre are unprotectable" and "do not demonstrate substantial similarity".  *Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1451 (9th Cir. 1988).

(vii)   Pace

*The Amityville Horror: A True Story* and *Amityville: The Awakening* both depict a steady procession of supernatural events which increase in frequency and intensity as the story nears its climax, but this is normal for a horror movie.  As a scene-a-faire, it is not protectable.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

d.      Plaintiff's List of Similarities Is Unreliable and Should Be Disregarded

Plaintiff's FAC, ¶58, includes a list of "similarities" she claims exist in the two works.  Such lists are often invoked by plaintiffs and upon examination suffer from the same deficiencies:  They mischaracterize the works, they abstract or trivialize to make the works seem more similar, and they take the materials out of context and make false comparisons.  Since *Litchfield*, virtually every Circuit rejects such lists as "inherently subjective and unreliable.  We are particularly cautious where, as here, the list emphasizes random similarities scattered throughout the works."  *Litchfield*, 736 F.2d at 1356.  Plaintiff's list should be disregarded.

3.      Plaintiff's Contributory and Vicarious Copyright Infringement Claims Fall Alongside Her Direct Infringement Claim

"'Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.'"  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001)).  Thus, because Plaintiff cannot prove that Defendants' Picture infringes Jay Anson's Book, her claims for contributory and vicarious copyright infringement must be dismissed.  *Id.*

4.      Plaintiff's Lanham Act False Advertising Claim Fails as a Matter of Law

a.      False advertising claims concerning a defendant's representations about the copyright licensing status of his works are barred by *Dastar*

Plaintiff's FAC emphasizes that the Lanham Act claim is not based on any alleged ownership of trademarks related to the Book, or the assertion of any rights available under Section 43(a)(1)(A) of the Lanham Act.  FAC, ¶97 (disavowing any reliance on 15 U.S.C. §1125(a)(1)(A)).[16]  Rather, Plaintiff alleges only that

---

[16] Section §1125(a)(1)(A) prohibits the use in commerce of any trademark, false

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

Defendants violated Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C.

§1125(a)(1)(B), which prohibits false advertising as follows:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which … **in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities**, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Id.* (emphasis added).

Plaintiff's FAC, ¶¶97-98, alleges Defendants committed false advertising by leading the public to believe the Picture was made pursuant to a copyright license in the book *The Amityville Horror: A True Story*, or in the 1979 or 2005 Amityville Horror movies.  Schilken Decl., ¶17, Ex. O (Responses to Interrogatories Nos. 1 and 3).  However, even assuming that Plaintiff's allegations in this respect are true (which Defendants deny), the Ninth Circuit has squarely held, following the U.S. Supreme Court's 2003 decision limiting the scope of Section 43(a)(1)(A) claims in *Dastar v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28, 123 S.Ct. 2041, 156 L.Ed.2d 18, that Section 43(a)(1)(B) false advertising claims based on alleged misrepresentations about copyright licensing status are not cognizable as a matter of law.  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008).

For context, in *Dastar*, the plaintiff sued defendants for selling an edited version of a documentary television series which had apparently fallen into the public domain under copyright law, due to failure to timely renew the copyright.  In advertisements and screen credits for the edited series, the defendants named

---

designation of origin, or false representation of fact that is likely to cause confusion as to the "affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]"

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

themselves as producers without crediting the producer of the original series (who was plaintiff's predecessor-in-interest).  *Id.* at 27, 28.  The plaintiff claimed this constituted false designation of origin of the video under §1125(a)(1)(A) of the Lanham Act, but the Supreme Court disagreed.  The Court held that the phrase "origin of goods" in §1125(a)(1)(A) "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods."  The Court noted defendants were permitted under copyright law to copy the documentary series, as the copyright had expired due to the failure to renew.  *Id.* at 33-34.  To allow the plaintiff to pursue a "reverse passing off" claim against defendants for copying the series without attribution "would create a species of mutant copyright law that limits the public's 'federal right to "copy and to use"' expired copyrights[.]"  *Id.* at 34.  As such, Plaintiff's interpretation of the Lanham Act conflicted with the law of copyright.

In *Sybersound*, the plaintiff sued defendants under the Lanham Act, alleging that they falsely advertised their karaoke records were properly licensed under copyright law.  The Ninth Circuit applied the Supreme Court's reasoning under *Dastar* in rejecting the plaintiff's false advertising claim under §1125(a)(1)(**B**).  The court held, "[f]ollowing the reasoning in *Dastar* …to avoid overlap between the Lanham and Copyright Acts, the nature, characteristics, and qualities of karaoke recordings under the Lanham Act are more properly construed to mean characteristics of the good itself," rather than licensing status.  517 F.3d at 1144.  *Accord*, *Micro/Sys, Inc. v. DRS Technologies, Inc.*, 2015 WL 12748631, *2 (C.D. Cal.) (relying on *Sybersound* to dismiss Lanham Act false advertising claim based on alleged misrepresentation regarding licensing status) ("The sole factual predicate for [Plaintiff's] Lanham Act claims is that [Defendant] misrepresented to USPS that it had acquired all necessary rights to the [Plaintiff's] XDOS software— i.e., that [Defendant] was providing a fully-licensed product.") (brackets added); *Prince v. Universal Music Corp.*, 2009 WL 10672282, *3 (C.D. Cal.) (dismissing

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

Lanham Act false advertising claim based on defendants' alleged misrepresentations that they were authorized to license the plaintiff's copyrights) ("Defendants are accused of falsely advertising their copyright licensing status. This claim is … barred by the reasoning of *Dastar* and the Ninth Circuit's evaluation of section 43(a)(1)(B) [in *Sybersound*]"); *Agence France Presse v. Morel*, 769 F.Supp.2d 295, 308 (S.D.N.Y. 2011) (news agencies' alleged misrepresentations that they were authorized to distribute plaintiff's copyrighted photographs were not actionable as Section 43(a)(1)(B) claims under *Dastar*); *see Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d 1300, 1307 (Fed. Cir. 2009) (*Sybersound* held "that the 'nature, characteristics, and qualities' language of Section 43(a)(1)(B) did not refer to the licensing status of a copyrighted good."); *Friedman v. Zimmer*, 2015 WL 6164787, *4 (C.D. Cal.) (*Sybersound* rejected plaintiff's argument that licensing status "was 'part of the nature, characteristics, or qualities of ... karaoke products'" under Section 43(a)(1)(B)).

Plaintiff is clearly seeking to leverage her Section 43(a)(1)(B) in order to claim rights in the Picture notwithstanding the fact, as discussed in detail above (*see, supra*, Sections III.B.1 & III.B.2.), it is neither virtually identical to, nor even substantially similar to, the Book as required to pursue a copyright claim.  However, because the Ninth Circuit's *Sybersound* opinion provides, so as to avoid potential tension with the Copyright Act, that alleged misrepresentations regarding copyright licensing status are not actionable as false advertising claims, Plaintiff's Lanham Act claim must be dismissed.

> 5.   <u>Plaintiff's California Unfair Competition Claims (§17200 and Common Law) Fail as a Matter of Law</u>

Plaintiff's Fifth Claim for Relief in the FAC asserts a single count of "unfair competition" under both (i) Bus. & Prof. Code §17200, *et seq.*, and (ii) California common law.  The FAC pleads that the predicate act for this cause of action is "Defendants' false advertising, marketing and promotion of the 2017 Amityville

Horror Sequel Film." FAC, ¶107. Both the §17200 claim and the common law claim fail, as set forth below.

          a.      Plaintiff's unfair competition claims must be dismissed because they are substantially congruent to and based on the same conduct as her defective Lanham Act claim

The Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code §17200 are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262-1263 (9th Cir. 1994) (affirming dismissal of statutory and common law unfair competition claims, after dismissal of Lanham Act claim). Because her Lanham Act claim fails under *Sybersound*, and because her common law and statutory unfair competition claims are based on precisely the same conduct as her Lanham Act claim (FAC, ¶¶97, 107), they must likewise be dismissed. *See, e.g., Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1182 (9th Cir. 2003) ("Rice concedes that his unfair competition claim under §17200 is dependent on his false advertisement claim under the Lanham Act … Because we conclude that the district court erred in not granting summary judgment to defendants on Rice's federal false advertising claim, we further conclude that defendants are entitled to summary judgment on Rice's state unfair competition claim as well.").

          b.      The §17200 and §17500 claim must be dismissed because Plaintiff cannot prove entitlement to restitution or injunctive relief

"[U]nder the UCL, '[p]revailing plaintiffs are generally limited to injunctive relief and restitution.'" *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144 (2003). Plaintiff cannot prove entitlement to either, as explained below. If Plaintiff cannot demonstrate her entitlement to either remedy, then this claim must be dismissed. *Madrid v. Perot Sys. Corp.*, 130 Cal.App.4th 440, 467 (2005).

          (i)      Plaintiff is not entitled to restitution

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

"A restitution order against a defendant [under the UCL] … requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 336 (2011) (brackets added). Restitutionary relief thus requires that the plaintiff have "an ownership interest in the money it seeks to recover from defendants." *Korea Supply Corp.*, 29 Cal.4th at 1149. The plaintiff must seek the return of either: 1) money or property that was once in her possession; or 2) money in which she has a vested interest. *Id.* The mere "expectancy" of the receipt of money – for example, an anticipated commission on a potential business transaction – is not a sufficient basis for restitution because it is merely a "contingent interest." *Id.*[17] "'Compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims.'" *Id.* at 1151 (citation omitted).

Here, Plaintiff cannot establish she suffered any economic injury other than impermissibly speculative "lost business opportunit[ies]" as the result of Defendants' alleged false advertising. In response to Interrogatories asking her to describe how she was injured, she said she lost revenue she *would have made* "from the licensing, granting, assigning, or otherwise economically exploiting her rights in the Novel." Schilken Decl., ¶18, Ex. P (Plaintiff's Amended Responses to Lionsgate's First Set of Interrogatories, No. 15); *see also id.* (No. 16). This is precisely the type of "expectancy" or "contingent interest" that does not suffice to establish entitlement to restitution. *Korea Supply Corp.*, 29 Cal.4th at 1149, 1151.

     (ii)    Plaintiff is not entitled to injunctive relief under §17200 because she lacks standing; she has not suffered an injury in fact or lost money or property as a result of the alleged unfair competition.

To have standing to bring a claim, including for injunctive relief, under Bus.

---

[17] Plaintiff's FAC also prays for the imposition of a "constructive trust" (p. 48, ¶24). However, a mere expectancy and contingent interest such as the kind Plaintiff has pleaded in the FAC is not a basis for the imposition of a constructive trust. *Korea Supply Corp.*, 29 Cal.4th at 1150.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

& Prof. Code §17200, the unfair competition law, or §17500, the false advertising law, a plaintiff must show that she has "suffered injury in fact and has lost money or property as a result of" the unfair competition or false advertising.  Bus. & Prof. Code, §§17204; 17535; *Kwikset Corp.*, 51 Cal.4th at 320-321.  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized …; and (b) actual or imminent, not conjectural or hypothetical[.]"  *Id.* at 322.

An alleged injury that is conjectural or hypothetical will not support a §17200 or §17500 claim.  *Bower v. AT&T Mobility, LLC*, 196 Cal.App.4th 1545, 1554-1555 (2011) (affirming dismissal of §17200 claim, where plaintiff alleged that retailer falsely informed her that charging her sales tax on her new cellular phone was mandatory; and thus that she was "'denied any opportunity' to shop around for a retailer that does not charge sales tax"); *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1049 (9th Cir. 2017) (affirming summary judgment against §17200 claim, where plaintiff alleged that defendants' unlawful text messaging caused his cellular service provider to increase its bundled pricing; "this argument is hypothetical and conjectural, and [plaintiff] has not demonstrated that any price increase was caused by Defendants' conduct.").

Here, the only injuries Plaintiff has alleged are purely hypothetical.  She alleges she lost revenue she would have made "from the licensing, granting, assigning, or otherwise economically exploiting her rights in the Novel."  Schilken Decl., ¶18, Ex. P (Plaintiff's Amended Responses to Lionsgate's First Set of Interrogatories, No. 15); *see also id.* (No. 16).  However, Plaintiff's Interrogatory responses fail to identify a single "actual or imminent" pending licensing deal or other transaction that was not completed, due to the alleged false advertising.  Rather, confirming that her claims of lost revenue are speculative, she said she would calculate these "lost revenues" by doing things like comparing the revenue generated by the 1979 film and 2017 Picture.  *Id.* (Response to Interrogatory No. 16).

In sum, Plaintiff does not identify any "actual or imminent" economic injury.

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400

Plaintiff's allegations that Defendants' conduct deprived her of potential revenue from some unidentified deal she may have made at an undetermined time to exploit yet another Amityville movie is a "conjectural" and "hypothetical" injury that does not confer standing.  (Notably, the Fifth Claim for Relief disavows any reliance on Plaintiff's claims of copyright infringement. FAC, ¶107.)

Plaintiff has further alleged that she lost licensing revenue she would have otherwise made by licensing the Book to <u>Defendants</u> for their movie *Amityville: The Awakening*.  *Id.* (Response to Interrogatory No. 16).  This circular theory of damages argues:  You falsely advertised that your movie was licensed from my book; and I lost money I would have made if your movie had been licensed from my book.  This is not "lost money or property" "<u>as a result of</u>" the alleged false advertising.  Bus. & Prof. Code, §§17204; 17535.  Plaintiff's statutory claim for injunctive relief must be dismissed.  *Id.*; *Kwikset Corp.*, 51 Cal.4th at 322.

> c.   The "common law unfair competition" claim fails because such claims encompass only infringement or misappropriation, not false advertising

Plaintiff alleges that Defendants committed "common law unfair competition" by falsely advertising and promoting the Picture.  FAC, 42:1-5, ¶107.  However, allegations of false advertising do not state a common law unfair competition claim.  *Dyson, Inc. v. Garry Vacuum, LLC*, 2010 U.S. Dist. LEXIS 153468, *25 (C.D. Cal. 2010) (granting motion to dismiss common law claim).

The elements of California common law unfair competition are: "(1) that [the plaintiff] invested substantial time, skill or money in developing its property; (2) that [the defendant] appropriated and used [the] property at little or no cost; (3) that [defendant's] appropriation and use of the … property was without the authorization or consent of [plaintiff]; and (4) that [plaintiff can] establish that it has been injured by [defendant's] conduct."  *City Solutions v. Clear Channel Communs., Inc*., 365 F.3d 835, 842 (9th Cir. 2004) (brackets added).  Plaintiff cannot prove Defendants

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400

used any "property" of hers.  To the contrary, the only "property" of Plaintiff that is at issue in this case is the copyright in the Book.  Not only has Plaintiff failed to show that Defendants did not infringe the copyright, but, presumably because she knows such a claim would be preempted, Plaintiff explicitly states that copyright infringement is <u>not</u> the basis for the Fifth Claim for Relief.  FAC, ¶107.

In *Dyson*, the cross-complainant, a rival of the vacuum manufacturer Dyson, Inc., alleged that Dyson made false representations about its products in advertisements.  The District Court held that allegations of false advertising did not state a common law unfair competition claim:

> [A]s the Ninth Circuit's opinion in *City Solutions* makes clear … all common law unfair competition claims involve some form of misappropriation, be it palming off, misuse of confidential information, or some other type of "appropriation and use of . . . property . . . without . . . authorization or consent."  … ***None of the cases cited by defendants support the conclusion that allegations of false advertising state a common law unfair competition claim, and the court has found no case so holding.***

*Id.* at 28 (emphasis added).  Here, because Plaintiff's common law unfair competition claim does not allege that Defendants engaged in any form of misappropriation of property, it fails as a matter of law.  *Id.* at *28-29.

## IV.   CONCLUSION

Defendants respectfully request that their Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment, be granted.

DATED:  January 13, 2020

Louis P. Petrich
Elizabeth L. Schilken
BALLARD SPAHR LLP


By:   ___/s/ Elizabeth L. Schilken___
       Elizabeth L. Schilken
Attorneys for Defendants
BOB WEINSTEIN, LIONS GATE
ENTERTAINMENT CORP., and
BLUMHOUSE PRODUCTIONS, LLC

Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA  90067-2909
Telephone: 424.204.4400